*In re* MARRIAGE OF JIMMIE PLEASANT, JR., Petitioner-Appellee, and SANDRA PLEASANT, Respondent-Appellant.

First District (3rd Division)   No. 1—91—3845

Opinion filed December 8, 1993.

Steven A. Drizin and Laura J. Miller, both of Northwestern University Legal Clinic, of Chicago, for appellant.

Milton A. Tornheim, Ltd., of Chicago, for appellee.

Gerald P. Nordgren, of DePaul Legal Clinic, of Chicago, guardian *ad litem*.

JUSTICE CERDA delivered the opinion of the court:

Petitioner, Jimmie Pleasant, Jr., brought this action on July 5, 1989, to modify provisions of a judgment of dissolution of marriage that had granted respondent, Sandra Pleasant, reasonable visitation with her son, Jimmie Pleasant III (Jimmie), including weekly unsupervised overnight visitation and extended unsupervised

visitation during summer vacations and school holiday breaks. On August 20, 1991, after a hearing, the post-decree court entered an order restricting Sandra's visitation rights by requiring that visitation be supervised by heterosexual employees of the Illinois Department of Children and Family Services, reducing her visitation to alternate weekends, eliminating overnight visitation, and requiring that Sandra enroll in regular psychotherapy with no apparent goals for such therapy.

On appeal, respondent asserts that (1) the post-decree court's finding of serious endangerment is against the manifest weight of the evidence; and (2) the post-decree court abused its discretion in denying her two motions for a change of venue. Respondent contends that the court's finding of serious endangerment is against the manifest weight of the evidence because it is improperly based on her being a lesbian. In contrast, petitioner asserts that the ruling was not based on respondent's being a lesbian, but on her alleged inappropriate actions in front of Jimmie.

The record indicates that there was no evidence of any inappropriate behavior in Jimmie's presence. The fact that respondent is openly involved in a lesbian relationship is not grounds to restrict respondent's visitation with her son. Thus, we reverse the post-decree court's judgment.

Petitioner and respondent were married in Chicago on November 1, 1973. On February 13, 1983, respondent gave birth to Jimmie, who is the couple's only child. On April 26, 1985, the parties were legally separated and respondent kept physical custody of Jimmie. In 1986, respondent began a lesbian relationship with Ann McBreen, who moved into the marital home where she, Jimmie, and respondent each had their own room.

Suspecting that there was a problem with Jimmie's development, respondent took Jimmie to the Chicago College of Osteopathic Medicine for an evaluation. After diagnosing Jimmie's test results as abnormal, Dr. Stephen Sheldon recommended further testing.

Respondent then took Jimmie to the University of Chicago Wyler Children's Hospital Department of Pediatrics. Dr. Tonsgard, a pediatric neurologist, diagnosed Jimmie as having some developmental delay and behavioral problems.

In November 1986, respondent took Jimmie to the University of Chicago Department of Psychiatry. Jimmie was evaluated during 14 days of tests and interviews. On January 16, 1987, the University of Chicago's evaluation diagnosed Jimmie as having a pervasive developmental delay with borderline mental retardation, attention deficit, and psychological disturbance. The evaluation concluded that

Jimmie's emotional disturbance interfered with his learning and social development.

Subsequently, respondent placed Jimmie in the Beacon School, which is a private school with a special education program designed specifically to address Jimmie's disability. During the summer of 1987, the parties consulted with a mediator, Dr. Leonore Levit. Dr. Levit suggested a home study and a psychiatric evaluation of both parents.

Dr. Miles Vachula, a child and adolescent psychiatrist, interviewed both parents. In his August 7, 1987, report, Dr. Vachula stated that he found no evidence that either parent had a psychotic thought disorder. He diagnosed petitioner as having adjustment reaction with a depressed mood and respondent as angry, hostile, and having adjustment reaction with mixed emotional features of some anxiety and depression.

Dr. Vachula stated that "the issue of the mother's homosexuality should not interfere with her being considered the custodial parent." Dr. Vachula recommended that Jimmie remain in his mother's custody with liberal visitation with his father. He also suggested that respondent seek psychotherapy to learn how to deal with her anger.

Brenda Sexton, a caseworker with the Cook County Department of Supportive Services, conducted an in-home study of both parents. She recommended a guardian *ad litem* (GAL) and psychiatric counseling for Jimmie as well as family counseling for all parties.

On March 20, 1988, after a trial during which respondent openly acknowledged that she was a lesbian in a relationship with Ms. McBreen, the trial court judge entered a judgment of dissolution of marriage. Petitioner was awarded sole custody of Jimmie and respondent was awarded reasonable visitation, including weekly overnight visitation. No restrictions were placed on visitation.

On July 5, 1989, petitioner filed an emergency motion for a rule to show cause and for modification of visitation. Subsequently, after it was determined that respondent had not disobeyed the court's visitation orders, petitioner withdrew his petition for the rule to show cause.

When petitioner appeared in court on the emergency petition, respondent had not yet been served and was not present. Nevertheless, the post-decree judge allowed petitioner's attorney to address the court. The attorney represented that respondent had abducted Jimmie, had been charged with the abduction, was heavily involved in the gay and lesbian community, and had subjected Jimmie to activities including the gay and lesbian pride parade.

Petitioner then testified that Jimmie told him that he had gone

to Wisconsin Dells with respondent and Ms. McBreen, that the three of them stayed in the same motel room, that respondent and Ms. McBreen slept in the same bed, and that respondent and Ms. McBreen hugged and kissed. In addition, petitioner stated that Jimmie told him that he had gone to a parade. After some investigation, petitioner determined that the only parade held during that time was a gay and lesbian pride parade.

Based on the representations and testimony, the post-decree judge suspended visitation until the next court date because he was concerned about "this lesbian stuff," which "is not in the best interests of a child."

On the next court date, respondent requested a substitution of judges on the basis that the post-decree judge had heard evidence during the July 5, 1989, *ex parte* hearing. The post-decree judge is not the trial judge. Denying the motion, the judge stated that he had heard the case over a number of years and that respondent's lesbian lifestyle was not in Jimmie's best interests.

On July 14, 1989, the judge held an *in camera* interview with Jimmie, who was six years old. Many of Jimmie's answers were incoherent, rambling, or contradictory. In response to questions about the trip to Wisconsin Dells, Jimmie said that he slept in a room by himself. When the judge asked where the respondent slept, the following discussion occurred:

"THE MINOR CHILD: In her room.

THE COURT: She had a separate room?

THE MINOR CHILD: Yes.

THE COURT: You had two rooms?

THE MINOR CHILD: Um-hum.

THE COURT: Where did Ann sleep?

THE MINOR CHILD: In her room?

THE COURT: How many rooms did you have?

THE MINOR CHILD: Two rooms and one room.

THE COURT: Two rooms and one room?

THE MINOR CHILD: Yes.

THE COURT: Did you go through—how did you go to the other room. Did you go through the door or have to go outside?

THE MINOR CHILD: Through the door.

THE COURT: Through the door?

THE MINOR CHILD: Um-hum.

THE COURT: You slept in one room?

THE MINOR CHILD: Yes.

THE COURT: And who slept in the other room?

THE MINOR CHILD: My ma.

THE COURT: Who?
THE MINOR CHILD: My mama and Ann.
THE COURT: Your mom and Ann?
THE MINOR CHILD: Yes."

When the judge asked Jimmie about the gay and lesbian pride parade, there was no indication that Jimmie was upset by the parade. In fact, he stated that he did not know what type of parade it was and that the people wore colorful shirts.

Then, the judge spoke extensively with Jimmie about whom his mother kissed. Jimmie stated that she kissed him and Ms. McBreen. When asked if respondent and Ms. McBreen were kissing on the fishing trip, Jimmie said that they were. He also stated that he kissed both respondent and Ms. McBreen.

During the subsequent court hearing, petitioner called respondent as an adverse witness. Respondent, who stated that she is a lesbian, testified that she lived alone in an apartment owned by her brother. Although she and Ms. McBreen were once lovers, they had been only friends since April 1988. When she and Ms. McBreen were lovers, respondent indicated that they would embrace in front of Jimmie, who would ask for a hug from both of them. Respondent stated, however, that Jimmie had never seen her and Ms. McBreen kiss. In addition, respondent testified that Jimmie had seen them in bed together, but never kissing each other in bed.

Respondent explained that on June 17, 1989, she went with Jimmie and Ms. McBreen to a Kankakee State Park campground, where she and Jimmie slept in one tent and Ms. McBreen slept in another tent. Respondent denied that she and Ms. McBreen stayed in the same bed together or that they hugged and kissed in front of Jimmie. Respondent stated that she and Ms. McBreen showed no signs of affection toward each other in front of Jimmie while on the trip.

Regarding the June 25, 1989, gay and lesbian pride parade, respondent testified that she went to the Gay-Lesbian Parents Group section to return books to a friend. When Jimmie saw people decorating a car with balloons and stuffed animals, he asked if he could play with a balloon. Respondent allowed Jimmie to sit in the car's front seat and play with a balloon. Since Jimmie was having fun, respondent decided to stay. During the parade, Jimmie sat in the car's back seat and waved the balloon out the window as respondent walked with the parents' group and passed out pamphlets to interested bystanders. When the parade ended, respondent and Jimmie left.

The post-decree judge questioned respondent extensively about Jimmie's presence at the gay and lesbian pride parade. After asking

whether it was an appropriate environment for Jimmie and whether it had an effect on his sexual orientation, the judge asked if there were men who are not masculine in the parade. When respondent answered that there were no "unmasculine" men in the parents group with which she walked, the judge argued with her about the presence of so-called "unmasculine" men.

Ms. McBreen, who is a marriage and family counselor, testified that her lesbian relationship with respondent began in February 1986. Subsequently, she lived with respondent for 1¹/₂ years. Ms. McBreen stated that their relationship as lovers ended in April 1988 because respondent had lost custody of Jimmie. Respondent had made it clear to Ms. McBreen that her relationship with Jimmie was her most important relationship.

Although respondent and Ms. McBreen showed affection toward each other before April 1988, they no longer showed any affection. Ms. McBreen testified that she and respondent did not caress in front of Jimmie because she does not believe that any sexual activities should occur in front of children.

In addition, Ms. McBreen testified that she, respondent, and Jimmie went camping on June 16 and 17, 1989, at Kankakee State Park. She slept in a pup tent while respondent and Jimmie slept in another tent. Ms. McBreen testified that she and respondent did not kiss or hug or be in the same bed during that trip.

At the close of all the testimony, the judge stated that respondent would be granted supervised visitation. Subsequently, in February 1990, DePaul Law Clinic was appointed as GAL for Jimmie.

After numerous continuances and settlement negotiations, a hearing was set for October 25, 1990. On that day, there was an off-the-record settlement hearing in chambers. Following the *in camera* conference, the judge stated in open court that there were serious allegations that alarmed him, but that there had been no testimony under oath. Thus, the judge stated that after conferring with the GAL, he was going to permit unsupervised visitation. The judge directed respondent to not have Jimmie in the presence of Ms. McBreen or any other person of known homosexual tendencies because it was not in Jimmie's best interests. In addition, respondent was not to take Jimmie to any gathering or place of a "homosexual nature."

Respondent stated that she was a lesbian and did not think she could abide by the judge's order to not have Jimmie in the presence of any persons with homosexual tendencies. The judge then abruptly terminated visitation.

On December 20, 1990, there was a hearing during which respondent testified that she would not take Jimmie to gay events, but

could not abide by the court's order about not being in the presence of gays or lesbians. Respondent explained that most of her personal friends were gays and lesbians.

The judge found that having Jimmie in the presence of gays and lesbians was endangering his gender identity and morals and not in his best interests. The judge denied visitation until there was supervision. The judge also amended his October 25, 1990, order to include a finding "[t]hat the Respondent/Mother, SANDRA PLEAS-ANT, express [sic] the inability to dissociate herself with known lesbians during periods of visitation is not in the best interests of the minor child, because it would seriously endanger the child's mental and moral well being."

On June 18, 1991, the hearing began. Harvey Bullocks, a social worker with the Cook County Department of Supportive Services, testified that he conducted a home study investigation in September 1990. Bullocks described the relationship between respondent and Jimmie as extremely close. During his conversation with respondent, she admitted that she had made some bad decisions concerning Jimmie in the past for which she was very sorry. She did not elaborate on that statement.

Bullocks further testified that respondent had told him that she took Jimmie to the gay and lesbian pride parade and was very sorry that she had. He did not recall if they specifically discussed the camping trip to Kankakee State Park.

Bullocks stated that it did not appear that respondent posed any threat or danger to Jimmie. After explaining that he is not an expert on alternative lifestyles, Bullocks expressed that it did not appear that respondent's lifestyle affected Jimmie negatively or caused his developmental problems. Recognizing that a court order for supervised visitation was in force, however, Bullocks recommended that supervised visitation continue so that petitioner's fears about respondent's lifestyle would be calmed.

Next, petitioner testified about the events of June 16, 1989, through June 26, 1989. His testimony was substantially the same as his previous testimony. The judge struck petitioner's testimony that Jimmie told him that he was at a parade and in Wisconsin because it was inadmissible hearsay.

In addition, petitioner testified that before July 1989, Jimmie was not happy when he returned from his visitations with his mother because he "couldn't understand why he was away from her for so long." Petitioner stated that there was no evidence of any physical harm to Jimmie and that he was not opposed to unsupervised visitation with the condition that there be no overnight visitations,

be only in public places, and respondent not take Jimmie to any gay events.

On the second day of the hearing, the judge had another *in camera* interview with Jimmie, who was then eight years old. Again, much of the interview was confusing and rambling. The judge asked Jimmie extensively about his camping trips with his mother. Jimmie said that he had been on many camping trips, including to Wisconsin. The following occurred:

"Q. When did you go to Wisconsin?

A. Long time ago. A couple weeks ago.

Q. Long time ago you went to Wisconsin?

A. Uh-huh.

Q. How long did you stay there?

A. Three days, a month.

Q. Where'd you go? To Wisconsin Dells?

A. Uh-huh.

Q. Okay. And where did you sleep?

A. In a room.

Q. In what room? You have a room by yourself?

A. (Moving head up and down)

Q. Nobody sleep with you in the room by yourself?

A. (Moving head up and down)

Q. Well, where was your mommy?

A. In the other room.

Q. What other room?

A. Two beds.

Q. What?

A. With two beds.

Q. It was too big?

A. Two beds.

Q. Two beds.

A. Uh-huh.

Q. You were in one room in one bed. Did you have one bed in your room?

A. (Moving head up and down)

Q. And how many beds did your mother have in her room?

A. Two.

Q. And who was with her in her room?

A. Ann."

Afterwards, the judge stated that he would give some weight to Jimmie's answers even though "he wasn't coherent for [the judge] to understand everything that he said." In addition, the judge stated that "[Jimmie's] ability to articulate *** [was] another problem."

When the hearing resumed, Lee Chandler, who was a lay volunteer with the court-appointed special advocate of the Illinois Action Counsel for Children, testified that she supervised the visitations between respondent and Jimmie. Chandler stated that they interacted beautifully and Jimmie was very open and loving with respondent.

Next, Dr. Vachula testified about his 1987 and April 1990 evaluations of the parents. Dr. Vachula stated that his 1990 report recommended visitation to be reduced to one supervised day every other week based primarily on petitioner's concern about the gay and lesbian pride parade. Dr. Vachula was concerned about respondent's relationship with Jimmie because he felt that Jimmie might not develop a gender role identity and may be confused about what it is to be a male. Dr. Vachula was also concerned that Jimmie was exposed to an alternative sexual lifestyle, which he considered a deviation from the norm and a variant behavior. Dr. Vachula, however, never met Jimmie.

Although Dr. Vachula saw no evidence of a major mood disorder or psychosis in respondent and found her to be less angry than in 1987, he recommended therapy to lower her level of anxiety, anger, depression, and stress. Dr. Vachula explained, however, that respondent's reactions were a normal response to the stress she was experiencing.

Petitioner's testimony was substantially the same as his earlier testimony. Respondent's testimony was also substantially the same as her earlier testimony, except that she informed the court that she had moved from her brother's building in November or December of 1990 and was again living with Ms. McBreen.

On August 20, 1991, the judge entered an order with the following findings:

> "That unlimited visitation by the Respondent with the minor child seriously endangers the child's mental, moral and emotional health for the following reasons:
>
> (a) The Respondent is a defiant and hostile admitted lesbian.
>
> (b) The minor child has a learning disability and a gender identity problem and that there is no strong evidence to support that the Respondent will be more discreet in terms of her exposition of her gay life-style in the child's presence, and notwithstanding the child's gender identification problem, which she learned in 1987, the Respondent took the child to a gay-lesbian parade.
>
> (c) That the Respondent slept in the same bed and kissed and hugged her partner in the child's presence.
>
> (d) That when the Respondent had an opportunity to have

unsupervised visitation on her promise that she would not take the child in the presence of any gays, she defiantly refused, stating, 'that she was a lesbian and that she would not promise that she would not take the child amongst her friends,' and the Court concludes that the Respondent's gay life was more important than her child.

(e) That the Respondent's life-style with her partner has caused the child to become confused as to why he has 'two mothers.'

(f) That the Respondent has been diagnosed as having a borderline personality disorder and it is ordered that she be involved in regular psychotherapy treatment."

The court then ordered that respondent have visitation supervised by the Illinois Department of Children and Family Services on alternate weekends, Saturday from 9 a.m. to 8 p.m. and Sunday from 8 a.m. to 8 p.m. In addition, the court ordered respondent to enroll in psychotherapy and have a progress report presented to the court in six months.

There is a strong public policy to preserve the relationship between a parent and child. (*In re Marriage of Ashby* (1990), 193 Ill. App. 3d 366, 378, 549 N.E.2d 923.) Section 607(c) of the Illinois Marriage and Dissolution of Marriage Act provides:

"[T]he court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral or emotional health." Ill. Rev. Stat. 1991, ch. 40, par. 607(c).

To promote a healthy and close relationship, there should be liberal visitation rights. (*In re Marriage of Brophy* (1981), 96 Ill. App. 3d 1108, 1112, 421 N.E.2d 1308.) In fact, a parent is entitled to visitation unless the visits would endanger the child. *In re Marriage of Neat* (1981), 101 Ill. App. 3d 1046, 1048, 428 N.E.2d 1093.

The endangerment standard is an extraordinary finding (*In re Marriage of Lombaer* (1990), 200 Ill. App. 3d 712, 724, 558 N.E.2d 388) that is onerous, stringent, and rigorous. (*In re Marriage of Diehl* (1991), 221 Ill. App. 3d 410, 429, 582 N.E.2d 281; *Ashby*, 193 Ill. App. 3d at 378; *In re Marriage of Blanchard* (1987), 162 Ill. App. 3d 202, 207, 514 N.E.2d 1208.) It is more stringent than the best interests standard, which is used to determine custody. *In re Marriage of Woppel* (1989), 178 Ill. App. 3d 781, 784, 533 N.E.2d 1002.

The burden is on the parent seeking the restriction to prove by a preponderance of the evidence that the current visitation seriously endangers the child's welfare. (*Blanchard*, 162 Ill. App. 3d at 207; *Neat*, 101 Ill. App. 3d at 1048.) Petitioner did not meet that burden.

Under the best interests standard in custody cases, the Illinois Supreme Court has explicitly rejected the presumption that a

parent's cohabitation establishes harm to the child. (*In re Marriage of Thompson* (1983), 96 Ill. 2d 67, 78, 449 N.E.2d 88; *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 344-45, 400 N.E.2d 421.) In deciding what impact a parent cohabiting with another person other than a spouse would have on a child custody proceeding, the supreme court in *Thompson* stated:

> "The *Jarrett* case does not establish a conclusive presumption that, because, a custodial parent cohabits with a member of the opposite sex, the child is harmed. The court in *Jarrett* indicated that a custody award is not arrived at by pressing one lever and mechanically denying custody to one parent; rather all of the circumstances must be considered that affect the best interests of the child." *Thompson*, 96 Ill. 2d at 78.

This approach, which is sexual-orientation neutral, is extended to visitation, which involves the more rigorous serious endangerment standard. Other jurisdictions have adopted a similar approach.

In a case very similar to this one, *In re Marriage of Ashling* (1979), 42 Or. App. 47, 50, 599 P.2d 475, 476, the Oregon Appellate Court reversed the lower court's restriction on visitation "being limited to such times and places that [the mother] does not have with her, in her home, or around the children any lesbians."

In *Ashling*, there was testimony that the mother, a lesbian, had sexual relations in the privacy of her bedroom when the children were in the house, but not in their presence. The mother also showed affection to other women in the children's presence, although she insisted that it was merely friendly, not passionate or sexual. (*Ashling*, 42 Or. App. at 50, 599 P.2d at 476.) The court concluded that the testimony did not justify the restrictive provision as "long as the mother's sexual practices remain discreet—a requirement whatever the sexual preferences of the parties might be." *Ashling*, 42 Or. App. at 50, 599 P.2d at 476.

Using the endangerment standard, the court in *In re Marriage of Cabalquinto* (1986), 43 Wash. App. 518, 718 P.2d 7, struck a visitation restriction which provided that "visitation is only permitted under circumstances where the father does not associate with his homosexual companion to the extent that the companion is a member of the household or the boy could get the idea that 2 men are other than casual friends, including not living in the home in any respect or having other than a casual relationship." *Cabalquinto*, 43 Wash. App. at 519, 718 P.2d at 7-8.

In *In re Marriage of Birdsall* (1988), 197 Cal. App. 3d 1024, 243 Cal. Rptr. 287, the California Appellate Court vacated the trial court's visitation restriction, which read: "Petitioner shall not exercise

overnight visitation with the minor child of the parties *** in the presence of any friend, acquaintance or associate who is known to be homosexual." *Birdsall*, 197 Cal. App. 3d at 1031, 243 Cal. Rptr. at 291.

In *Conkel v. Conkel* (1987), 31 Ohio App. 3d 169, 509 N.E.2d 983, the appellate court affirmed the homosexual father's award of overnight visitation based on the best interests standard. The court took "judicial notice that there is substantial consensus among experts that being raised by a homosexual parent does not increase the likelihood that a child will become homosexual." *Conkel*, 31 Ohio App. 3d at 172, 509 N.E.2d at 986.

In *Bezio v. Patenaude* (1980), 381 Mass. 563, 579, 410 N.E.2d 1207, 1215, pursuant to the mother's petition to remove the children's guardian and restore custody to herself, the Massachusetts Appellate Court reversed the lower court finding that the mother's lesbian household would create instability that would adversely affect the children's welfare. Not only was there no such evidence, but the appeals court relied on expert testimony that there is no correlation between the custodial parent's sexual orientation and the child's mental health or ultimate sexual preference. *Bezio*, 381 Mass. at 579, 410 N.E.2d at 1215-16.

The appellate court in *Stroman v. Williams* (1987), 291 S.C. 376, 378, 353 S.E.2d 704, 705, ruled that the mother's lesbianism did not mandate a change in custody because there was no evidence that the child was adversely affected by it. The father's mere allegations were not sufficient. *Stroman*, 291 S.C. at 378, 353 S.E.2d at 705.

The post-decree judge relied on *Gottlieb v. Gottlieb* (1985), 108 A.D.2d 120, 488 N.Y.S.2d 180, and *DiStefano v. DiStefano* (1978), 60 A.D.2d 976, 401 N.Y.S.2d 636, both of which used the best interests standard, not the endangerment standard. In *Gottlieb*, the court held that there was sufficient evidence to restrict visitation of the homosexual father so that the child would not be involved in homosexual activities or publicity. (*Gottlieb*, 108 A.D.2d at 120, 488 N.Y.S.2d at 180-81.) The court stated that any sexual conduct that takes place in the children's presence has an adverse effect on the children. *Gottlieb*, 108 A.D.2d at 120, 488 N.Y.S.2d at 181.

In *DiStefano*, which involved a custody dispute, the appellate court found that there was sufficient evidence that the mother's failure to keep her lesbian relationship separate from her role as a mother had a detrimental effect on the children. (*DiStefano*, 60 A.D.2d at 977, 401 N.Y.S.2d at 638.) The court did not state what that evidence was.

The *DiStefano* court also ruled that it was proper to restrict the

mother's visitation so that her lesbian lover be excluded from contact with the mother and children during visitation periods. (*DiStefano*, 60 A.D.2d at 977, 401 N.Y.S.2d at 638.) The reason for the restriction was that the evidence showed that the lover made repeated efforts to alienate the children from their father. *DiStefano*, 60 A.D.2d at 977, 401 N.Y.S.2d at 638.

Both *Gottlieb* and *DiStefano* are distinguishable. There is no evidence in this case that any sexual conduct occurred in Jimmie's presence or that Ms. McBreen has tried to alienate Jimmie from his father. Most importantly, there is no evidence that respondent's lesbian relationship with McBreen has interfered with her role as Jimmie's mother or has had a detrimental effect on Jimmie.

■ We find that the post-decree court's ruling and factual findings are against the manifest weight of the evidence. There is no evidence in the record that respondent is a defiant and hostile lesbian or that Jimmie has any confusion about having "two mothers."

Furthermore, there is no evidence that Jimmie has a gender identity problem. Although Dr. Vachula testified that he was concerned that Jimmie might "not develop a gender role identity and that he might be confused about what it is like to be a male," he did not testify that Jimmie has a gender role identity problem. In fact, Dr. Vachula never even spoke with Jimmie.

The finding that respondent slept in the same bed and kissed and hugged Ms. McBreen in Jimmie's presence is erroneous because it was based on Jimmie's *in camera* statements, which were not testimony. There was no finding that Jimmie was competent to testify, he was not sworn, and there was no cross-examination. Even if it were admissible testimony, Jimmie was often confused, incoherent, and could not be understood.

The only other evidence that respondent and Ms. McBreen had hugged and kissed came from petitioner, who testified that Jimmie had told him. The judge struck that testimony because it was inadmissible hearsay.

Even if the finding had been accurate, however, respondent's behavior would not seriously endanger Jimmie. There was no evidence that there was any sexual conduct or other inappropriate conduct in Jimmie's presence. Seeing two consenting adults hug and kiss in a friendly manner is not harmful to Jimmie. In fact, Jimmie said that he also hugged and kissed both his mother and Ms. McBreen.

In making his findings, the judge improperly relied on his personal belief that homosexuality creates serious endangerment. In his memorandum for the August 10, 1991, order, he included a section

entitled "HOMO SEXUALITY," which was based on a book that was not introduced into evidence or even mentioned during the proceedings. The judge improperly relied on a publication that had not been presented at trial.

Finally, it is clear that the judge improperly used the best interests standard instead of the serious endangerment standard. Although the final order includes a finding of endangerment, throughout the proceedings the judge continuously referred to Jimmie's best interests.

The post-decree judge improperly based his decision on respondent's lesbianism. Sexual orientation is not relevant to a parent's visitation rights. It is relevant only if it directly harms Jimmie. The evidence established that respondent's sexual orientation does not have a detrimental effect on Jimmie. Furthermore, the evidence indicates that Jimmie was not upset by the gay and lesbian pride parade. Instead, he greatly enjoyed himself.

It is also irrelevant that respondent lives with her lesbian lover. What is relevant is whether Jimmie is adversely affected by that cohabitation. We find that he is not. Not only is there no evidence that Jimmie was upset with respondent's relationship with Ms. McBreen, but the evidence established that Jimmie has a warm and loving relationship with his mother as well as a close relationship with Ms. McBreen. Jimmie made it clear in his discussion with the judge that he loves his mother and Ms. McBreen.

We are disturbed by the judge's numerous homophobic comments. His personal beliefs improperly clouded his judgment. Consequently, for the last four years, a little boy has been deprived of unrestricted visits with his mother.

Next, respondent asserts that the post-decree court abused its discretion in denying her two motions for change of venue. Petitioner argues that respondent has waived the change of venue argument because it was not included in the notice of appeal.

■ The issue is not waived. Generally, the notice of appeal is liberally construed. (*Jewel Cos. v. Serfecz* (1991), 220 Ill. App. 3d 543, 547, 581 N.E.2d 186.) An appeal from a judgment that is not specified in the notice of appeal is not waived if it is "a step in the procedural progression leading to the judgment specified in the notice of appeal." (*Jewel Cos.*, 220 Ill. App. 3d at 547-48.) Furthermore, an appeal from a subsequent final judgment will draw into question all orders that were final interlocutory rulings that were not appealable when entered. (*Burtell v. First Charter Service Corp.* (1979), 76 Ill. 2d 427, 394 N.E.2d 380; *First National Bank v. St. Charles National Bank* (1987), 152 Ill. App. 3d 923, 930, 504 N.E.2d 1257.) Since venue orders

are nonfinal, nonappealable orders (*Mexicali Club, Inc. v. Illinois Liquor Control Comm'n* (1976), 37 Ill. App. 3d 797, 799, 347 N.E.2d 190) and are a step in the procedural process, the change of venue issue is not waived.

As to the merits of the February 5, 1991, motion for a change of venue, respondent contends that the court abused its discretion because she alleged actual prejudice. The motion focused on the judge's many biased statements about gays and lesbians and on his hostility to respondent, respondent's attorney, and witnesses who had testified favorably to her position.

We agree that the record is replete with homophobic statements that indicate that the judge was prejudiced against respondent and acted according to that prejudice. Thus, the judge's denial of the change of venue was an abuse of discretion. Because the change of venue should have been allowed, any future post-decree issues are to be resolved before a different judge.

We decline to address the other issues raised by respondent on appeal because our decisions are dispositive. Based on the foregoing, we reverse the post-decree court's August 20, 1991, and October 30, 1991, orders and reinstate the trial court's orders of May 20, 1988. Further, we reverse the post-decree court's denial of respondent's February 5, 1991, motion for a change of venue.

Reversed.

RIZZI and GREIMAN, JJ., concur.