5th Division
November 27, 1996.
No. 1-94-3937

THE PEOPLE OF THE SATTE OF ILLINOIS,)
 ) APPEAL FROM THE CIRCUIT 
 Plaintiff-Appellee, ) COURT OF COOK COUNTY
 )
 v. ) 
 ) HONORABLE JOHN E.
SHERARD MARTIN, ) MORRISSEY AND ARTHUR
 ) ROSENBLUM, JUDGES
 Defendant-Appellant. ) PRESIDING.
 ) 

 JUSTICE GORDON delivered the opinion of the court:

 Defendant, Sherard Martin, appeals from the order of the
juvenile division of Circuit Court of Cook County transferring
him to the criminal division for trial as an adult on the charge
of first degree murder. After the transfer, the defendant was
convicted of that charge and was sentenced to a 25-year term of
imprisonment in the Illinois Department of Corrections. The
defendant appeals from the transfer order and contends that, if
the transfer order is reversed, his conviction in the criminal
court should be reversed and the case remanded for a new transfer
hearing.
 On June 17, 1992, the defendant, who was 14 years old, was
arrested for the murder of Fred Harper. In accordance with
section 5-4(3) of the Illinois Juvenile Court Act of 1987 (the
Juvenile Court Act) (705 ILCS 405/5-4(3) (1992)), the State moved
for entry of an order permitting prosecution of the defendant as
an adult.
 At the hearing on the transfer motion, the testimony of the
State's witnesses revealed that on May 9, 1992 nineteen-year-old
Fred Harper, the victim, and Vascoe Zinnerman, his friend, saw a
car parked outside Zinnerman's house with its windows broken. As
Harper and Zinnerman made inquiries as to who had broken the
windows, they encountered four youths, one of whom was the
defendant. The defendant and Harper had "exchanged words"
earlier that day. As the defendant approached Harper, Harper
pulled a beer bottle from a trash can and held the bottle at his
side. Words were exchanged and Harper dropped the beer bottle
and turned to walk away. Thereafter, Zinnerman saw one of the
youths hand a gun to another of the youths. He grabbed Harper
and began to run. The youth holding the gun fired it striking
Harper in his back as he was walking away. Harper died on June
10, 1992 as a result of the injuries he sustained from the
shooting. Zinnerman identified the defendant in a line-up as the
person who fired the gun.
 On June 17, 1992, the defendant was questioned by the police
and confessed to shooting Harper. In his written statement
prepared at the police station, the defendant stated that he
encountered Harper and Zinnerman at approximately 8 p.m. on the
night of the shooting. At that time, Harper and Zinnerman were
riding their bicycles. Harper accused the defendant of calling
him a "hype" (a slang for drug dealer), threatened to beat the
defendant up and then rode away. Thereafter, the defendant and
his friend, Reginald, went to a garage and the defendant
retrieved a ".38 special." The defendant stated that later that
evening he, Reginald and two additional friends walked toward a
McDonald's restaurant and passed Zinnerman's house and the car
with the broken windows. While they were at the McDonald's
restaurant, Harper came into the restaurant, looked at them and
left. When the defendant and his friends left the restaurant,
Harper and Zinnerman were walking about 20 feet away. Harper
took a bottle from a garbage can and put it under his jacket. 
When Harper and Zinnerman were about 6 or 7 feet away, they
turned and stood in front of the defendant and his friends. The
defendant stated that Harper accused him of breaking the car
windows but he denied that he had and pulled out his gun, holding
it at his side. Zinnerman walked away while Harper continued to
stand there for about a minute or two. After Harper turned to
walk away and was about 15 or 16 feet away, the defendant shot
him.
 Irene Porter, the probation officer assigned to the
defendant in November 1991, after he had been adjudicated a
delinquent based upon the commission of a theft, was called by
the State and testified that in 1991 she conducted a social
investigation of defendant's family, maintained almost monthly
contact with the defendant, and provided him with "minimum"
counseling consistent with her limited abilities and training. 
(Porter had been a probation officer for thirteen years and had
two years of training in family therapy.) Porter also had
several conversations with defendant's mother and made calls to
defendant's school. The mother gave no negative reports; and the
defendant was attending school regularly but was maintaining a
"D" average.
 Porter testified that in 1991 the defendant had "three
station adjustments" for two batteries and a disorderly conduct
offense and one court referral for theft of an automobile. 
Porter identified a social report she prepared dated June 26,
1992; a supplemental report dictated January 20, 1993; and a
supplemental report and addendum dictated June 8, 1993 which she
prepared for purposes of the instant hearing. Porter testified
that before she prepared her third report she had become aware of
seventeen rule violations committed by the defendant while he was
at the juvenile detention center.
 Porter acknowledged that in her first report, she noted that
the defendant had no remorse after shooting Harper and was only
concerned as to when he would be released. That report contained
no expressed preference as to whether the defendant should remain
in the juvenile correctional system. Porter's second report
contained the recommendation that the defendant remain in the
juvenile system. That recommendation was based upon defendant's
admission to her of only two rule violations. At that time, she
felt that the defendant was responding to the "intervention of
the detention center" by the teachers, social workers and other
people who were there to address his needs. After Porter became
aware of the seventeen rule violations, she prepared a third
report because she saw the development of a pattern of behavior. 
In that report Porter recommended that the defendant be tried as
an adult.
 On cross-examination, Porter stated that she was not trained
to provided intensive counseling for severe conduct disorders or
other psychological problems. In her opinion, based upon her
discussions with the defendant and four conversations with
defendant's mother, the defendant's earlier problems were not
severe enough to warrant that type of counseling. She stated
that her first conversation with defendant's mother lasted over
an hour and the remaining three lasted about ten minutes each. 
She also stated that, when she met with the defendant, he was
polite and cooperative. When asked about defendant's behavior at
the detention center, Porter stated that she received positive
reports from defendant's teachers and that his performance
improved at the center over a period of time.
 When questioned about the reports she prepared, Porter
testified that when she prepared the first report, she was aware
of the services offered by the juvenile and adult systems but was
unsure as to which one would best meet the defendant's needs. 
She further stated that, after reviewing the rule violation
reports and after talking with school personnel at the detention
center, she became aware of other facets to the defendant's
personality. That information combined with a review of
defendant's legal history, led her to change her recommendation
in favor of transfer. She admitted that she never talked to any
of the people who issued the rule violations and never determined
whether the violations actually occurred. Porter knew that if
the defendant were convicted by the juvenile court he could only
be detained until he was twenty-one years old whereas if he was
convicted in the adult system he could be sentenced to twenty
years in the penitentiary.
 "Nonpublishable material omitted under Supreme Court Rule 23."
 Doctor Derrick I. Miller, a psychiatrist whose expertise in
the area of child and adolescent psychiatry was stipulated to by
the State, testified concerning his experience in studying,
diagnosing and treating delinquent and anti-social adolescents. 
Miller testified that he interviewed the defendant on four
occasions for a total of approximately four hours; interviewed
the defendant's mother for approximately one hour; and read
various police and social worker reports concerning the
defendant. Miller also visited the St. Charles Youth Center, a
correctional facility operated by the juvenile division of the
Illinois Department of Corrections.
 Miller opined that the defendant was treatable because he
was able to make trusting relationships with people and that the
St. Charles facility would provide an appropriate treatment
program for the defendant. Miller stated that that facility
could meet the defendant's need to identify with positive male
role models. In Miller's opinion, the defendant would need to be
treated for about two years.
 Miller stated that his determination that the defendant was
treatable was influenced by the fact that the defendant did not
enjoy violence and did not intend to kill Harper. According to
Miller, the defendant intended to shoot Harper in the buttocks to
frighten him and prevent future conduct. That action was a
learned response, learned within defendant's family environment
such as when defendant's mother shot and killed her abusive
boyfriend. Miller stated that when he interviewed the defendant,
the defendant indicated that the hospital was responsible for
Harper's death. Miller stated that the defendant could learn a
more effective technique for handling fear during his detention.
 With respect to the defendant's commission of disciplinary
violations at the detention center, Miller surmised that the
commission of those violations would not mean that the defendant
was not amenable to treatment. Miller stated that the violations
occurred because the defendant, in seeking male relationships,
would test the attendants to see how they would handle him when
he was being difficult. According to Miller, the defendant would
respect and admire the attendant if the attendant handled him
well. Miller also testified that the defendant was very educable
and that the defendant was positive about his schooling at the
detention center. In Miller's opinion, the defendant would lose
motivation if he knew he would be transferred to the adult
system.
 On cross-examination, Miller testified that he had not
visited or had any experience with the adult division of the
Department of Corrections. He admitted that there were
educational and vocational programs at adult facilities but could
not answer the question as to whether there would be any
differences in the treatment of the defendant at the juvenile
division facilities as opposed to the adult division facilities. 
He admitted that when investigating defendant's rule violations
the only person he talked to was the defendant.
 Upon questioning from the court, Miller stated that at the
time of the shooting and at the time of the transfer hearing the
defendant was "amoral." Miller stated that the defendant had
some degree of control over his actions, that he knew what he was
doing at the time of the shooting, and that he used violence to
deter Harper from returning.
 "Nonpublishable material omitted under Supreme Court Rule
23."
 At the conclusion of the transfer hearing, the trial court
granted the State's petition to transfer prosecution of the
defendant to the criminal division. The court's ruling was
prefaced by an extensive review of the evidence and testimony
which comprised thirty-one pages of the record. The defendant
challenges several comments which will be discussed below as they
relate to the issues raised.
 On appeal, the defendant argues that the trial court's order
granting the State's motion to transfer should be reversed for
the following reasons: (1) he was denied a fair and impartial
hearing because the trial court was prejudiced against
psychiatric expert testimony and failed to recuse himself because
of that prejudice; (2) the trial court improperly relied upon
evidence outside the record; and (3) the trial court's
determination in favor of transfer was an abuse of discretion.
 The waiver of jurisdiction by a juvenile court is a critical
action that determines important statutory rights of a juvenile
and, as such, must be occur within the limits of due process and
within applicable statutory guidelines. People v. Clark, 119
Ill. 2d 1, 518 N.E.2d 138 (1987) citing Kent v. United States,
383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966). In
Illinois, the transfer determination is discretionary with the
juvenile court based upon its consideration of seven factors
enumerated in section 5-4 of the Juvenile Court Act. 705 ILCS
405/5-4 (West 1992). See Clark, 119 Ill. 2d 1, 518 N.E.2d 138;
People v. Newell, 135 Ill. App. 3d 417, 481 N.E.2d 1238 (1985). 
Those factors, which balance the rehabilitative interests of the
alleged juvenile offender against society's interest in
protection from criminal victimization (Clark, 119 Ill. 2d 1, 518
N.E.2d 138), include: (1) whether there is sufficient evidence
upon which a grand jury may be expected to return an indictment;
(2) whether there is evidence that the alleged offense was
committed in an aggressive and premeditated manner; (3) the age
of the minor; (4) the previous history of the minor; (5) the
treatment and rehabilitation of the minor; (6) whether the best
interest of the minor and the security of the public may require
that the minor continue in the custody or under supervision for a
period extending beyond his minority; and (7) whether the minor
possessed a deadly weapon when committing the alleged offense. 
705 ILCS 405/5-4 (West 1992). No one factor is determinative nor
is each factor required to be given equal weight. Newell, 135
Ill. App. 3d 417, 481 N.E.2d 1238; People v. Thomas, 94 Ill. App.
3d 895, 419 N.E.2d 480 (1981). The State need only present
sufficient evidence to persuade the court that transfer is
warranted in light of these statutory criteria. People v.
Taylor, 76 Ill. 2d 289, 391 N.E.2d 366 (1979). Where the record
shows that the juvenile court considered all of the factors and
that its determination was not an abuse of discretion, the
court's ruling will be affirmed on appeal. Clark, 119 Ill. 2d 1,
518 N.E.2d 138; Newell, 135 Ill. App. 3d 417, 481 N.E.2d 1238.
 The defendant first argues that he was denied a fair,
impartial and unbiased transfer hearing based upon certain
statements made by the trial judge which the defendant contends
evidenced a prejudice against psychiatric experts. In support of
this argument, the defendant excerpts the following statements
made by the trial judge occurring on one and one-half pages of
the record:
 "There is a recent book called "Once Upon a Time". I
 may be bringing evidence, in my opinion, which maybe I
 shouldn't. In that book the woman remembered her
 father killed her best friend twenty years before; a
 psychiatric theory now called exhumed [sic] memory. 
 You remember a fact that you were raped by your father
 or something like that.
 But American courts have characteristically
 referred to psychiatrists and psychologists to tell
 jurists what they ought to decide. The results have
 been an industry of hired guns. Hired guns with
 degrees who can be counted on to render their signature
 without undue attention to the problem at hand.
 Three habitual witnesses have, therefore, found
 ample employment, contradicting one another. There is
 an epidemic of psychiatrists and psychologists which
 hasn't prevented anyone with a credential and an ax to
 grind from hurrying to the courtroom to describe under
 oath his pet conception of mental functioning, as if it
 established a scientific fact.
 When the State's Attorney is here and here and
 here, they may not know as much as we do. That's
 what's pointed out in this very well written treatise. 
 It says In Broad Daylight, that's the name, it points
 out their effectiveness with a jury has more to do with
 their charisma.
 The less educated juror was fully as qualified to
 guess what was going on in the witnesses mind as the
 most expert witness money could buy." S.R. 878-80
 The defendant argues that these comments demonstrate the
preexistence of strong personal prejudice against psychiatric
expert testimony and that the trial judge could not fairly
evaluate and weigh the testimony of his expert witness, Doctor
Miller. The defendant further contends that because of his
prejudice, the trial judge should have recused himself when he
became aware that psychiatric testimony would be presented. 
According to the defendant, the judge's failure to recuse himself
sua sponte violated Canon 3(C)(1)(a) of the Illinois Code of
Judicial Conduct (113 Ill. 2d R. 63(C)(1)(a) (1986)) and amounted
to reversible error. See People v. Austin, 116 Ill. App. 3d 95,
451 N.E.2d 593 (1983) (violation of judicial canon may result in
reversible error).
 Comments which prejudge the credibility of a class of
witnesses without regard to the individual credibility of each
witness and which dismiss as unworthy any body of expertise
otherwise recognized as providing admissible probative evidence
are egregious and should be condemned. However, remarks of this
nature should be viewed in context and should be evaluated in
terms of trial judge's specific reaction to the witnesses
involved in the particular case. See People v. Hannon, 48 Ill.
2d 462, 273 N.E.2d 9 (1971) (when evaluating bias based upon
judge's comment, reviewing court will review entire context of
comment). In that respect, and in context, we note that the
judge's comments highlighted by the defendant in the instant case
occurred on less than two pages of the thirty-one-page oral
pronouncement. We also note that the judge's use of the words
"hired guns" and "habitual witnesses" was not directed
specifically at defendant's psychiatric witness, Doctor Miller. 
They were made in the context of the judge's reference to two
books he had read, the appropriateness of which will be discussed
below, that apparently discussed the use of expert witnesses such
as psychiatrists and psychologists in trials. The judge's
reference to those books was brief and appears to be the judge's
interpretation of the authors' opinions of expert testimony. 
When viewed in context, there is no compelling indication in the
record that the trial judge shared the authors' beliefs or that
the judge failed to consider the psychiatric testimony offered by
the defendant. In point of fact, the judge's comments appear to
be directed towards demonstrating, perhaps, under the
circumstances, inappropriately, an awareness of some forensic
literature dealing with the subject rather than any personal
prejudgment or belief.
 Our conclusion that the conduct of the trial judge was not
sufficient to establish judicial bias against defendant's
witness, Doctor Miller, is supported by the fact that immediately
preceding the comments excerpted by the defendant the judge
stated the following:
 "Now we pick up Dr. Miller. I find him imminently
 [sic] qualified. He works for Northwestern Clinic. I
 think he was honest in what he said and I accept what
 he said." S.R. 878
 Moreover, at the conclusion of the remarks excerpted by the
defendant, the judge stated:
 "So, I don't discount what Dr. Miller said, but I want
 to point out some of the things he did say. Some of
 the things I think was [sic] right on the button." 
 S.R. 880
 Thereafter, in discussing Miller's testimony, the judge stated
that he agreed with Miller's testimony that the defendant's home
was disruptive and dysfunctional; that the defendant associated
with excessive violence and was under stress; that the defendant
lacked a male role model; that the defendant chose to shoot
Harper and the shooting was a correctional action taken by the
defendant against Harper; and that the defendant had no respect
for authority. The trial judge's impartiality and open-
mindedness toward Miller also was demonstrated by the fact that
the trial judge personally directed numerous questions to Miller
during the transfer hearing. The judge asked Miller about the
defendant's lack of and need for a male role model; whether
defendant's transfer to the adult system would impede his
progress and cause a loss of motivation; whether the defendant
would get a sense of accountability if he were sent to the adult
system; whether the juvenile or adult penal systems in Illinois
followed programs of treatment similar to the successful programs
conducted by Miller; whether Miller could predict that in three
years the defendant would be a normal, contributing member in
society; whether Miller had evaluated any juvenile facility other
than the one located in St. Charles; whether the defendant was
able to link his shooting of Harper with Harper's death; whether
the defendant's use of violence when he was under stress could be
corrected within three years; and whether at the time of the
shooting and at the time of trial the defendant was amoral or
immoral. See People v. Blanck, 263 Ill. App. 3d 224, 635 N.E.2d
1356 (1994) (isolated comment by trial judge did not establish
actual prejudice or that trial judge would be unable to act
fairly); McClelland v. McClelland, 231 Ill. App. 3d 214, 595
N.E.2d 1131 (1992) (viewing record as a whole, cumulative effect
of inappropriate remarks by trial judge did not deprive
petitioner of fair trial or constitute reversible error); In re
Marriage of Tisckos, 161 Ill. App. 3d 302, 514 N.E.2d 523 (1987)
(on review of record as a whole, trial judge's improper comment
was made in passing and was not reflective of bias requiring
reversal). Cf. People v. Eckert, 194 Ill. App. 3d 667, 551
N.E.2d 820 (1990) (defendant denied fair trial where repeated
expressions of hostility against defense counsel by court and
where improper restrictions placed on counsel during cross-
examination). Thus, when the judge's comments and actions
throughout the course of the transfer hearing are viewed in their
entirety, we cannot say that the judge was biased or prejudiced
against psychiatric experts as a whole or against defendant's
expert, Doctor Miller, specifically, such that the defendant was
denied a fair and impartial transfer hearing. Because we find
that, when viewed in context, we are unable to conclude that the
trial judge exhibited a predisposed bias, we correspondingly
cannot conclude that there was a violation of any judicial cannon
resulting from the judge's failure to sua sponte recuse himself.
 The defendant next argues that the trial court improperly
relied upon evidence outside the record, namely, the two books
mentioned above, and whether the trial judge improperly
speculated as to the length of time that the defendant would
serve if convicted as an adult or if adjudicated as a juvenile.
 It is well settled that a trial court's deliberations are
limited to the record made before him during the course of trial,
and the trial court cannot make a determination based upon its
private investigation or knowledge untested by cross-examination
or rules of evidence. E.g., People v. Wallenberg, 24 Ill. 2d
350, 181 N.E.2d 143 (1962); People v. Gilbert, 68 Ill. 2d 252,
369 N.E.2d 849 (1977); In re Marriage of Pleasant, 256 Ill. App.
3d 742, 628 N.E.2d 633 (1993). It is also well settled that when
the trial court is the trier of fact every presumption will be
accorded that the judge considered only admissible evidence and
disregarded inadmissible evidence in reaching his conclusion. 
Wallenberg, 24 Ill. 2d 350, 181 N.E.2d 143; Gilbert, 68 Ill. 2d
252, 369 N.E.2d 849. In the instant case we do not believe that
this presumption was rebutted by the record before us. See
Gilbert, 68 Ill. 2d 252, 369 N.E.2d 849. Here, all that the
record shows with respect to the two books is that the trial
judge made a reference to them in a little more than one page of
a thirty-one page pronouncement in the record. The judge
prefaced his citation to the books with a statement that he found
Doctor Miller to be "eminently" qualified and acknowledged that
"[he] may be bringing in evidence *** which maybe [he]
shouldn't." The judge concluded his reference to the books by
stating that he was not "discounting" Doctor Miller's testimony. 
That the judge was not biased against Miller is further supported
by the record which is replete with questions posed by the judge
to Miller which show an attempt by the judge to understand
Miller's testimony and its ramifications.
 Moreover, as will be discussed below, the trial judge made
his determination in favor of transfer after making extensive
findings with respect to the seven statutory factors delineated
in section 5-4 of the Juvenile Court Act. It is the court's
extensive review of the evidence as it related to the transfer
statute and the court's focus on that evidence rather than on the
authors' opinions in the two books that distinguishes this case
from the cases cited by the defendant. In those cases, i.e.,
People v. McMiller, 410 Ill. 338, 102 N.E.2d 128 (1951); People
v. Cooper, 398 Ill. 468, 75 N.E.2d 885 (1947); Pleasant, 256 Ill.
App. 3d 742, 628 N.E.2d 633 (1993); and Patton v. Armstrong, 6
Ill. App. 3d 998, 286 N.E.2d 351 (1972), the trial judges'
recorded statements clearly indicated that they had considered
matters dehors the record and relied upon those matters in
reaching their decisions.
 We also reject defendant's contention that the trial court
improperly considered speculative evidence regarding the length
of time that the defendant would serve if convicted as an adult
or if adjudicated as a juvenile.
 In the instant case the court estimated that the time the
defendant would serve if he were tried and convicted as an adult
would be the minimum twenty-year term of imprisonment. See 730
ILCS 5/5-8-1(a)(1) (West 1992). The court further stated that
the defendant could earn twelve and one-half years of credit,
based upon good conduct and educational credits, such that he
would serve only seven and one-half years. See 730 ILCS 5/3-6-
3(2) (West 1992). The court compared that figure to the time the
defendant could be held within the juvenile system, which was
until his twenty-first birthday, a period of six years.
 One of the factors to be considered by the court in making a
transfer determination is whether the best interest of the minor
and the security of the public may require that the minor
continue in custody or under supervision for a period extending
beyond his minority. 705 ILCS 405/5-4(2)(b)(vi) (West 1992). 
That factor requires a balancing of the competing interests of
the minor and society and recognizes that it may be necessary to
incarcerate the minor beyond his minority. People v. Clark, 119
Ill. 2d 1, 518 N.E.2d 138 (1987). As stated in Clark, 119 Ill.
2d at 15, 518 N.E.2d at 144, that "balancing calls for
consideration of which penalty [incarceration to age 21 under the
juvenile system or incarceration under the Criminal Code (720
ILCS 5/1-1 et seq. (West 1992)] would best serve both of the
interests at stake." In performing that balancing, the court
must consider the range of penalties under both systems.
 The defendant concedes that the trial court could consider
the range of sentence that the minor could receive if convicted
in the adult system. The defendant also concedes that the
parties stipulated that, if convicted of first degree murder as
an adult, the defendant would face a mandatory sentence of
between twenty and sixty years in prison. See 730 ILCS 5/5-8-
1(a)(1) (West 1992). The defendant argues, however, that the
court engaged in speculation in presuming that, if convicted as
an adult, the defendant would be sentenced to the minimum twenty-
year term of imprisonment and that the defendant would receive
credits for good conduct to reduce the time he would actually
serve. We disagree.
 There is no compelling indication from the record that the
court ignored the possibility that the defendant could receive a
sentence greater than twenty years if tried as an adult. In
order to determine whether the penalty under the Juvenile Court
Act or the penalty under the Criminal Code would best serve both
the competing interests of the minor and society (see Clark, 119
Ill. 2d at 15, 518 N.E.2d at 144), the trial court was required
to consider the interplay between the relevant sentencing
statutes and to extrapolate from that based upon the evidence
before him. Admittedly, the penalty to be imposed upon the
defendant under the Criminal Code was not definitive because it
would be discretionary with the sentencing judge after trial and
conviction. The juvenile court judge was well aware of that fact
because he continuously prefaced its calculations in this regard
by using the word "if". It would seem that, in order to compare
the statutory penalties, the judge should not be precluded from
considering which sentence was more likely provided the judge
does not confuse likelihood with certainty. Here, based upon the
nature of the crime and the defendant's background, the court
suggested that a twenty-year term of imprisonment was a more
reasonable sentence under the Criminal Code. (In point of fact,
that possibility was very close to the twenty-five year sentence
actually imposed.)
 We note that the defendant has cited no case which prohibits
a judge from considering the more likely sentence within the
statutory range based upon the nature of the crime and other
relevant facts such as the defendant's background and record. 
The only case cited by the defendant is People v. Gilbert, 68
Ill. 2d 252, 369 N.E.2d 849 (1977) which held that it is improper
for a trial judge to conduct experiments or private
investigations to produce evidence not introduced at trial. No
experiment or investigation was conducted independently by the
juvenile court judge in the instant case.
 When considering defendant's potential sentence under the
Criminal Code, the court also was free to take into account the
defendant's ability to earn good conduct credits that would
reduce his time served. That consideration was not speculative
since good conduct credits are statutorily mandated (see 730 ILCS
5/3-6-3(2) (West 1992)) and since the good behavior for earning
those credits is within the defendant's control. Although the
judge could not predict how the defendant would conduct himself
while incarcerated, he could consider that the defendant, through
his conduct, would reduce his sentence.
 In performing the required balancing, the court is mandated
to compare the potential lengths of sentence as an adult with the
limited range of sentence under the Juvenile Act which would
compel defendant's release upon his reaching the age of majority. 
Based upon these considerations, the trial court concluded that
the defendant could not be rehabilitated within the period of
time he could be detained within the juvenile court system and
that the interests of society and the minor required that the
minor continue in custody for a period extending beyond his
minority. See In Interest of L.J., 274 Ill. App. 3d 977, 654
N.E.2d 671 (1995) (comparing penalties and determining that best
interest of minor and society required that minor be tried as
adult); People v. Booth, 265 Ill. App. 3d 462, 637 N.E.2d 580
(1994) (court found society would not be protected if juvenile
incarcerated under the Juvenile Court Act).
 Defendant's final argument on appeal is that the trial
court's order granting the State's motion to transfer was an
abuse of discretion. We disagree.
 The record in the instant case shows that the trial court
conducted a full hearing and rendered its decision after
examining the seven factors specified in section 5-4 of the
Juvenile Court Act. With respect to those factors, the court
specifically found that: (1) there was sufficient evidence upon
which the grand jury could indict the defendant; (2) the
defendant did not act in self-defense but, rather, committed the
offense in an aggressive and premeditated manner as evidenced by
the fact that he retrieved the gun prior to the incident and shot
the victim as he walked away and without provocation; (3) the
defendant was within the statutory age requirement; (4) the
defendant had a history of violence when rebuffed; and (5) the
defendant possessed a deadly weapon when committing the alleged
offense. With respect to the final two factors, whether juvenile
facilities were available for treatment and rehabilitation and
whether the best interest of the minor and the security of the
public required that the defendant remain in the custody for a
period extending beyond his minority, the court made extensive
remarks. The court cited to Irene Porter's testimony and
reports, her belief that the defendant has a propensity toward
violence, and her final recommendation in favor of transfer. The
court discussed the testimony of Doctor Miller, who was found to
be "imminently [sic] qualified" and "honest," concerning
defendant's dysfunctional and disruptive home life, lack of a
male role model, and lack of remorse based upon a belief that he
shot Harper but that the hospital caused Harper's death. The
court noted Miller's testimony that the defendant's actions were
committed by choice and designed to punish Harper for a wrong
Harper had committed against the defendant. The court disagreed,
however, with Miller's estimation that the defendant could be
rehabilitated after two years of treatment in the juvenile
division particularly since Miller did not know what counseling
the defendant would receive or whether the defendant would be
cooperative.
 In addition, the court noted its personal observations of
the defendant and the lack of any expression of emotion or
remorse shown by him. The court stated that the defendant's face
was "impassive" and that he was "amoral," perhaps because he was
not "exposed to any love and tenderness and kindness." The court
stated, "I don't believe that the juvenile court has facilities
necessary to treat him and correct him. *** He needs long
treatment."
 The court then discussed the testimony of the remaining
witnesses including defendant's four witnesses who had contact
with him while he was held in the juvenile detention center, who
stated that the defendant was a good student, had not been a
disciplinary problem, and could be rehabilitated in the juvenile
system. In that regard, the court noted that those various
witnesses were not psychiatrists and had limited knowledge of
defendant's rule violations.
 Finally, the court discussed the evidence offered with
respect to the differences in juvenile and adult correctional
facilities finding that the education provided in both types of
facilities was the same; that vocational training was available
in both; and that counseling and medical treatment were available
in both, acknowledging, though, that those services were more
limited in the adult system. The court concluded by comparing
the time the defendant would serve if incarcerated under the
Criminal Code and if incarcerated under the Juvenile Court Act.
 Based upon these specific considerations, it is clear that
the trial court weighed the last two transfer factors,
availability of facilities for treatment and rehabilitation and
the interests of the minor and society, as he had weighed the
other five factors, in favor of transfer. In that regard, the
court was free to give greater weight to the testimony of Irene
Porter, defendant's juvenile probation officer, who had had the
longest affiliation with the defendant, who discussed defendant's
propensity toward violence and who recommended transfer, rather
than to Miller's expert testimony that the defendant's violent
nature could be corrected in the juvenile system in two years. 
See People v. Liggett, 90 Ill. App. 3d 663, 413 N.E.2d 534 (1980)
(court is not required to accept opinion of expert concerning
psychological prognosis of defendant). In reaching its decision
in favor of transfer, the court also could consider the fact that
Miller had only visited the St. Charles juvenile facility and had
no familiarity with the other juvenile facilities or any of the
adult correction facilities.
 The defendant argues that the court's comment that the
defendant showed no remorse during the transfer hearing amounted
to a violation of the defendant's Fifth Amendment right against
self-incrimination. In support of this argument, the defendant
cites to several cases in which reversible error occurred as a
result of improper comment regarding a defendant's failure to
testify. E.g., Lesko v. Lehman, 925 F.2d 1527 (3rd Cir. 1991),
cert. denied, 502 U.S. 898 (1991); U.S. v. Safirstein, 827 F.2d
1380 (9th Cir. 1987); People v. Ramirez, 98 Ill. 2d 439, 457
N.E.2d 31 (1983). Those cases are distinguishable from the case
at bar because the reprehensible remarks that occurred in them
were directly related to the defendants' failures to testify
after they asserted their Fifth Amendment rights. See Lesko, 925
F. 2d 1527 (improper prosecutorial comment regarding defendant's
failure to testify on the merits when defendant testified at
penalty stage); Safirstein, 827 F.2d 1380 (improper enhancement
of sentence where defendant penalized for exercising privilege
against self-incrimination and failing to implicate others or
otherwise admit guilt); Ramirez, 98 Ill. 2d 439, 457 N.E.2d 31
(improper prosecutorial comment regarding defendant's failure to
testify during sentencing hearing although defendant testified at
trial). Only in Lesko does the comment made by the prosecutor
during closing argument include a reference to the defendant's
failure to "say that I'm sorry." Viewed in its entirety,
however, that comment was construed by the court to be "a
condemnation of Lesko's failure to testify about his role in the
events surrounding the *** homicide." 925 F.2d at 1544. Here,
unlike in the cases cited by the defendant, the remark made by
the trial judge, that the defendant lacked remorse, cannot be
construed as implicating the defendant's failure to testify. 
Rather, as is apparent from the remarks set out above, the judge
was commenting on the defendant's demeanor and lack of affect
with respect to a crime whose commission the defendant admitted
to in a writing not challenged on any constitutional grounds. 
See People v. Nelson, 92 Ill. App. 3d 35, 42, 415 N.E.2d 688, 694
(1980) (evidence regarding defendant's demeanor is not within the
Fifth Amendment privilege); see also Smith v. Estelle, 602 F. 2d
694, 704 (5th Cir. 1979), aff'd on other grounds, 451 U.S. 454,
101 S. Ct. 1866, 68 L.Ed. 2d 359 (1981) (suggesting that
psychiatrist's conclusions concerning defendant's manner or
deportment, his attention span or facial expressions, are not a
communicative act protected by the Fifth Amendment).
 Moreover, the judge's observations and conclusions with
respect to the defendant's affect were corroborated by the
defendant's own psychiatric expert who testified that the
defendant was "amoral," consciously chose to shoot Harper after
Harper had turned to walk away, and was unable to link his act of
shooting Harper as being the cause of Harper's death. There is
no question that defendant's own witness can testify to the
defendant's amorality based upon his overt communication with the
defendant. This is to be distinguished, however, from the
holding in the Supreme Court case of Estelle v. Smith, 451 U.S.
454, 101 S. Ct. 1866, a case cited by the defendant, which
involved the admission of testimony from a court-appointed
psychiatrist. In that case, the psychiatrist sought to testify
concerning the defendant's lack of remorse or sorrow based not
upon the psychiatrist's observance of the defendant's demeanor
but based upon statements the defendant made to the psychiatrist
during the psychiatric examination. The Estelle court held that
the psychiatrist's testimony regarding communicative acts of the
defendant was inadmissible because the defendant had not been
admonished before the psychiatric examination that his statements
could be used against him. Here, as noted, the court's
conclusions that the defendant lacked remorse and was "amoral"
were based upon its own observations of the defendant's demeanor
during the court proceedings as well as the testimony of the
defendant's psychiatrist whose observations of the defendant's
demeanor and communications with the defendant were not subject
to the constitutional restraints that attach to communications
with a defendant by court-appointed psychiatrists.
 The defendant's transfer hearing was extensive and
sufficient evidence to support the court's transfer determination
was presented. While there was evidence to support a contrary
determination, we cannot say that trial court's grant of the
State's motion to transfer was an abuse of discretion. See
Clark, 119 Ill. 2d at 19-20, 518 N.E.2d at 146-47 for listing of
cases wherein evidence found sufficient to support trial court's
transfer determination.
 For the foregoing reasons, the judgment of the circuit court
of Cook County is affirmed.
 Affirmed.
 COUSINS, Jr. and HOURIHANE, JJ., concur.