THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHERARD MARTIN, Defendant-Appellant.

First District (5th Division)   No. 1—94—3937

Opinion filed November 27, 1996.—Rehearing denied January 6, 1997.

624

Thomas F. Geraghty, Steven A. Drizin, and Quentin D. Vaughn, law student, all of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Alan J. Spellberg, and Elizabeth Scholz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Defendant, Sherard Martin, appeals from the order of the juvenile division of the Circuit Court of Cook County transferring him to the criminal division for trial as an adult on the charge of first degree murder. After the transfer, the defendant was convicted of that charge and was sentenced to a 25-year term of imprisonment in the Illinois Department of Corrections. The defendant appeals from the transfer order and contends that, if the transfer order is reversed, his conviction in the criminal court should be reversed and the case remanded for a new transfer hearing.

On June 17, 1992, the defendant, who was 14 years old, was arrested for the murder of Fred Harper. In accordance with section 5—4(3) of the Illinois Juvenile Court Act of 1987 (the Juvenile Court

Act) (705 ILCS 405/5—4(3) (West 1992)), the State moved for entry of an order permitting prosecution of the defendant as an adult.

At the hearing on the transfer motion, the testimony of the State's witnesses revealed that on May 9, 1992, 19-year-old Fred Harper, the victim, and Vascoe Zinnerman, his friend, saw a car parked outside Zinnerman's house with its windows broken. As Harper and Zinnerman made inquiries as to who had broken the windows, they encountered four youths, one of whom was the defendant. The defendant and Harper had "exchanged words" earlier that day. As the defendant approached Harper, Harper pulled a beer bottle from a trash can and held the bottle at his side. Words were exchanged and Harper dropped the beer bottle and turned to walk away. Thereafter, Zinnerman saw one of the youths hand a gun to another of the youths. He grabbed Harper and began to run. The youth holding the gun fired it, striking Harper in his back as he was walking away. Harper died on June 10, 1992, as a result of the injuries he sustained from the shooting. Zinnerman identified the defendant in a lineup as the person who fired the gun.

On June 17, 1992, the defendant was questioned by the police and confessed to shooting Harper. In his written statement prepared at the police station, the defendant stated that he encountered Harper and Zinnerman at approximately 8 p.m. on the night of the shooting. At that time, Harper and Zinnerman were riding their bicycles. Harper accused the defendant of calling him a "hype" (a slang for drug dealer), threatened to beat the defendant up and then rode away. Thereafter, the defendant and his friend, Reginald, went to a garage and the defendant retrieved a ".38 special." The defendant stated that later that evening he, Reginald and two additional friends walked toward a McDonald's restaurant and passed Zinnerman's house and the car with the broken windows. While they were at the McDonald's restaurant, Harper came into the restaurant, looked at them and left. When the defendant and his friends left the restaurant, Harper and Zinnerman were walking about 20 feet away. Harper took a bottle from a garbage can and put it under his jacket. When Harper and Zinnerman were about six or seven feet away, they turned and stood in front of the defendant and his friends. The defendant stated that Harper accused him of breaking the car windows, but he denied that he had and pulled out his gun, holding it at his side. Zinnerman walked away while Harper continued to stand there for about a minute or two. After Harper turned to walk away and was about 15 or 16 feet away, the defendant shot him.

Irene Porter, the probation officer assigned to the defendant in November 1991, after he had been adjudicated a delinquent based

upon the commission of a theft, was called by the State and testified that in 1991 she conducted a social investigation of defendant's family, maintained almost monthly contact with the defendant, and provided him with "minimum" counseling consistent with her limited abilities and training. (Porter had been a probation officer for 13 years and had two years of training in family therapy.) Porter also had several conversations with defendant's mother and made calls to defendant's school. The mother gave no negative reports; and the defendant was attending school regularly but was maintaining a "D" average.

Porter testified that in 1991 the defendant had "three station adjustments" for two batteries and a disorderly conduct offense[1] and one court referral for theft of an automobile.[2] Porter identified a social report she prepared dated June 26, 1992; a supplemental report dictated January 20, 1993; and a supplemental report and addendum dictated June 8, 1993, which she prepared for purposes of the instant hearing. Porter testified that, before she prepared her third report, she had become aware of 17 rule violations committed by the defendant while he was at the juvenile detention center.

Porter acknowledged that, in her first report, she noted that the defendant had no remorse after shooting Harper and was only concerned as to when he would be released. That report contained no expressed preference as to whether the defendant should remain in the juvenile correctional system. Porter's second report contained the recommendation that the defendant remain in the juvenile system. That recommendation was based upon defendant's admission to her of only two rule violations. At that time, she felt that the defendant was responding to the "intervention of the detention center" by the teachers, social workers and other people who were there to address his needs. After Porter became aware of the 17 rule violations, she prepared a third report because she saw the development of a pattern of behavior. In that report Porter recommended that the defendant be tried as an adult.

---

[1]"Station adjustments" are events where the police, after taking a juvenile to the police station, decide that the juvenile will not be prosecuted. *People v. M.D.*, 101 Ill. 2d 73, 79, 461 N.E.2d 367, 370 (1984). Evidence of "station adjustments" is probative and relevant at juvenile transfer hearings. *People v. Newell*, 135 Ill. App. 3d 417, 481 N.E.2d 1238 (1985).

[2]Porter stated that, during the period of June 1991 through January 1992, the defendant had two additional court referrals for attempted vehicle theft and aggravated battery. One referral was dismissed and the other was stricken.

On cross-examination, Porter stated that she was not trained to provide intensive counseling for severe conduct disorders or other psychological problems. In her opinion, based upon her discussions with the defendant and four conversations with defendant's mother, the defendant's earlier problems were not severe enough to warrant that type of counseling. She stated that her first conversation with defendant's mother lasted over an hour and the remaining three lasted about 10 minutes each. She also stated that, when she met with the defendant, he was polite and cooperative. When asked about defendant's behavior at the detention center, Porter stated that she received positive reports from defendant's teachers and that his performance improved at the center over a period of time.

When questioned about the reports she prepared, Porter testified that, when she prepared the first report, she was aware of the services offered by the juvenile and adult systems but was unsure as to which one would best meet the defendant's needs. She further stated that, after reviewing the rule violation reports and after talking with school personnel at the detention center, she became aware of other facets to the defendant's personality. That information, combined with a review of defendant's legal history, led her to change her recommendation in favor of transfer. She admitted that she never talked to any of the people who issued the rule violations and never determined whether the violations actually occurred. Porter knew that if the defendant were convicted by the juvenile court he could only be detained until he was 21 years old, whereas if he was convicted in the adult system, he could be sentenced to 20 years in the penitentiary.[3]

Doctor Derrick I. Miller, a psychiatrist whose expertise in the area of child and adolescent psychiatry was stipulated to by the State, testified concerning his experience in studying, diagnosing and

---

[3]The State and the defendant each called penology experts who testified concerning the range of educational, counseling, mental health and medical services available at the juvenile and adult divisions of the Illinois Department of Corrections. Both witnesses stated that all of these services were available in each division but that there were waiting lists for certain programs in the adult division. Both witnesses also stated that the ratio of counselor to juvenile was significantly better than the ratio of counselor to inmate. In order to comply with the appellate court page limitations specified by Supreme Court Rule 23 (166 Ill. 2d R. 23), a more complete summary of this testimony has been eliminated from the text of this opinion. For a full discussion of that testimony, see the entire unabridged "hybrid" opinion of *People v. Martin*, Docket No. 1—94—3937, filed with the clerk of this court.

treating delinquent and anti-social adolescents. Miller testified that he interviewed the defendant on four occasions for a total of approximately four hours; interviewed the defendant's mother for approximately one hour; and read various police and social worker reports concerning the defendant. Miller also visited the St. Charles Youth Center, a correctional facility operated by the juvenile division of the Illinois Department of Corrections.

Miller opined that the defendant was treatable because he was able to make trusting relationships with people and that the St. Charles facility would provide an appropriate treatment program for the defendant. Miller stated that that facility could meet the defendant's need to identify with positive male role models. In Miller's opinion, the defendant would need to be treated for about two years.

Miller stated that his determination that the defendant was treatable was influenced by the fact that the defendant did not enjoy violence and did not intend to kill Harper. According to Miller, the defendant intended to shoot Harper in the buttocks to frighten him and prevent future conduct. That action was a learned response, learned within defendant's family environment such as when defendant's mother shot and killed her abusive boyfriend. Miller stated that when he interviewed the defendant, the defendant indicated that the hospital was responsible for Harper's death. Miller stated that the defendant could learn a more effective technique for handling fear during his detention.

With respect to the defendant's commission of disciplinary violations at the detention center, Miller surmised that the commission of those violations would not mean that the defendant was not amenable to treatment. Miller stated that the violations occurred because the defendant, in seeking male relationships, would test the attendants to see how they would handle him when he was being difficult. According to Miller, the defendant would respect and admire the attendant if the attendant handled him well. Miller also testified that the defendant was very educable and that the defendant was positive about his schooling at the detention center. In Miller's opinion, the defendant would lose motivation if he knew he would be transferred to the adult system.

On cross-examination, Miller testified that he had not visited or had any experience with the adult division of the Department of Corrections. He admitted that there were educational and vocational programs at adult facilities but could not answer the question as to whether there would be any differences in the treatment of the defendant at the juvenile division facilities as opposed to the adult divi-

sion facilities. He admitted that when investigating defendant's rule violations the only person he talked to was the defendant.

Upon questioning from the court, Miller stated that at the time of the shooting and at the time of the transfer hearing the defendant was "amoral." Miller stated that the defendant had some degree of control over his actions, that he knew what he was doing at the time of the shooting, and that he used violence to deter Harper from returning.[4]

At the conclusion of the transfer hearing, the trial court granted the State's petition to transfer prosecution of the defendant to the criminal division. The court's ruling was prefaced by an extensive review of the evidence and testimony, which comprised 31 pages of the record. The defendant challenges several comments, which will be discussed below as they relate to the issues raised.

On appeal, the defendant argues that the trial court's order granting the State's motion to transfer should be reversed for the following reasons: (1) he was denied a fair and impartial hearing because the trial court was prejudiced against psychiatric expert testimony and failed to recuse itself because of that prejudice; (2) the trial court improperly relied upon evidence outside the record; and (3) the trial court's determination in favor of transfer was an abuse of discretion.

■ The waiver of jurisdiction by a juvenile court is a critical action that determines important statutory rights of a juvenile and, as such, must be within the limits of due process and within applicable statutory guidelines. *People v. Clark*, 119 Ill. 2d 1, 8, 518 N.E.2d 138 (1987), citing *Kent v. United States*, 383 U.S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045 (1966). In Illinois, the transfer determination is discretionary with the juvenile court based upon its consideration of seven factors enumerated in section 5—4 of the Juvenile Court Act. 705 ILCS 405/5—4 (West 1992). See *Clark*, 119 Ill. 2d 1, 518 N.E.2d 138; *People*

---

[4]Also deleted from the text of this opinion, for purposes of compliance with Supreme Court Rule 23 (166 Ill. 2d R. 23), is the testimony of four defense witnesses. Those witnesses, defendant's teacher, counselor, social worker and program administrator, testified concerning defendant's behavior during the school portion of his detention. Each had favorable comments regarding the defendant's classroom work and participation and stated that the defendant had not presented any disciplinary problems. None of the witnesses were knowledgeable of the defendant's 17 rule violations, which occurred during his detention but outside of the school environment. For a more complete summary of this testimony, see the entire unabridged "hybrid" opinion filed with the clerk of this court in the cause of *People v. Martin*, Docket No. 1—94—3937.

*v. Newell*, 135 Ill. App. 3d 417, 481 N.E.2d 1238 (1985). Those factors, which balance the rehabilitative interests of the alleged juvenile offender against society's interest in protection from criminal victimization (*Clark*, 119 Ill. 2d 1, 518 N.E.2d 138), include: (1) whether there is sufficient evidence upon which a grand jury may be expected to return an indictment; (2) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (3) the age of the minor; (4) the previous history of the minor; (5) the treatment and rehabilitation of the minor; (6) whether the best interest of the minor and the security of the public may require that the minor continue in the custody or under supervision for a period extending beyond his minority; and (7) whether the minor possessed a deadly weapon when committing the alleged offense. 705 ILCS 405/ 5—4 (West 1992). No one factor is determinative nor is each factor required to be given equal weight. *Newell*, 135 Ill. App. 3d 417, 481 N.E.2d 1238; *People v. Thomas*, 94 Ill. App. 3d 895, 419 N.E.2d 480 (1981). The State need only present sufficient evidence to persuade the court that transfer is warranted in light of these statutory criteria. *People v. Taylor*, 76 Ill. 2d 289, 391 N.E.2d 366 (1979). Where the record shows that the juvenile court considered all of the factors and that its determination was not an abuse of discretion, the court's ruling will be affirmed on appeal. *Clark*, 119 Ill. 2d 1, 518 N.E.2d 138; *Newell*, 135 Ill. App. 3d 417, 481 N.E.2d 1238.

The defendant first argues that he was denied a fair, impartial and unbiased transfer hearing based upon certain statements made by the trial judge which, the defendant contends, evidenced a prejudice against psychiatric experts. In support of this argument, the defendant excerpts the following statements made by the trial judge occurring on $1^1/2$ pages of the record:

"There is a recent book called 'Once Upon a Time.' I may be bringing evidence, in my opinion, which maybe I shouldn't. In that book the woman remembered her father killed her best friend twenty years before; a psychiatric theory now called exhumed [*sic*] memory. You remember a fact that you were raped by your father or something like that.

But American courts have characteristically referred to psychiatrists and psychologists to tell jurists what they ought to decide. The results have been an industry of hired guns. Hired guns with degrees who can be counted on to render their signature without undue attention to the problem at hand.

Three habitual witnesses have, therefore, found ample employment, contradicting one another. There is an epidemic of psychiatrists and psychologists which hasn't prevented anyone

with a credential and an ax to grind from hurrying to the courtroom to describe under oath his pet conception of mental functioning, as if it established a scientific fact.

When the State's Attorney is here and here and here, they may not know as much as we do. That's what's pointed out in this very well written treatise. It says In Broad Daylight, that's the name, it points out their effectiveness with a jury has more to do with their charisma.

The less educated juror was fully as qualified to guess what was going on in the witnesses mind as the most expert witness money could buy."

The defendant argues that these comments demonstrate the preexistence of strong personal prejudice against psychiatric expert testimony and that the trial judge could not fairly evaluate and weigh the testimony of his expert witness, Doctor Miller. The defendant further contends that, because of his prejudice, the trial judge should have recused himself when he became aware that psychiatric testimony would be presented. According to the defendant, the judge's failure to recuse himself *sua sponte* violated Canon 3(C)(1)(a) of the Illinois Code of Judicial Conduct (113 Ill. 2d R. 63(C)(1)(a)) and amounted to reversible error. See *People v. Austin*, 116 Ill. App. 3d 95, 451 N.E.2d 593 (1983) (violation of judicial canon may result in reversible error).

■ Comments that prejudge the credibility of a class of witnesses without regard to the individual credibility of each witness and that dismiss as unworthy any body of expertise otherwise recognized as providing admissible probative evidence are egregious and should be condemned. However, remarks of this nature should be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the witnesses involved in the particular case. See *People v. Hannon*, 48 Ill. 2d 462, 273 N.E.2d 9 (1971) (when evaluating bias based upon judge's comment, reviewing court will review entire context of comment). In that respect, and in context, we note that the judge's comments highlighted by the defendant in the instant case occurred on less than two pages of the 31-page oral pronouncement. We also note that the judge's use of the words "hired guns" and "habitual witnesses" was not directed specifically at defendant's psychiatric witness, Doctor Miller. They were made in the context of the judge's reference to two books he had read, the appropriateness of which will be discussed below, that apparently discussed the use of expert witnesses such as psychiatrists and psychologists in trials. The judge's reference to those books was brief and appears to be the judge's interpretation of the authors' opinions of expert testimony.

When viewed in context, there is no compelling indication in the record that the trial judge shared the authors' beliefs or that the judge failed to consider the psychiatric testimony offered by the defendant. In point of fact, the judge's comments appear to be directed towards demonstrating, perhaps, under the circumstances, inappropriately, an awareness of some forensic literature dealing with the subject rather than any personal prejudgment or belief.

Our conclusion that the conduct of the trial judge was not sufficient to establish judicial bias against defendant's witness, Doctor Miller, is supported by the fact that immediately preceding the comments excerpted by the defendant the judge stated the following:

"Now we pick up Dr. Miller. I find him imminently [sic] qualified. He works for Northwestern Clinic. I think he was honest in what he said and I accept what he said."

Moreover, at the conclusion of the remarks excerpted by the defendant, the judge stated:

"So, I don't discount what Dr. Miller said, but I want to point out some of the things he did say. Some of the things I think was [sic] right on the button."

Thereafter, in discussing Miller's testimony, the judge stated that he agreed with Miller's testimony that the defendant's home was disruptive and dysfunctional; that the defendant associated with excessive violence and was under stress; that the defendant lacked a male role model; that the defendant chose to shoot Harper and the shooting was a correctional action taken by the defendant against Harper; and that the defendant had no respect for authority. The trial judge's impartiality and open-mindedness toward Miller also were demonstrated by the fact that the trial judge personally directed numerous questions to Miller during the transfer hearing. The judge asked Miller about the defendant's lack of and need for a male role model; whether defendant's transfer to the adult system would impede his progress and cause a loss of motivation; whether the defendant would get a sense of accountability if he were sent to the adult system; whether the juvenile or adult penal system in Illinois followed programs of treatment similar to the successful programs conducted by Miller; whether Miller could predict that in three years the defendant would be a normal, contributing member in society; whether Miller had evaluated any juvenile facility other than the one located in St. Charles; whether the defendant was able to link his shooting of Harper with Harper's death; whether the defendant's use of violence when he was under stress could be corrected within three years; and whether at the time of the shooting and at the time of trial the defendant was amoral or immoral. See *People v. Blanck*, 263 Ill. App.

3d 224, 635 N.E.2d 1356 (1994) (isolated comment by trial judge did not establish actual prejudice or that trial judge would be unable to act fairly); *McClelland v. McClelland*, 231 Ill. App. 3d 214, 595 N.E.2d 1131 (1992) (viewing record as a whole, cumulative effect of inappropriate remarks by trial judge did not deprive petitioner of fair trial or constitute reversible error); *In re Marriage of Tisckos/ Stewart*, 161 Ill. App. 3d 302, 514 N.E.2d 523 (1987) (on review of record as a whole, trial judge's improper comment was made in passing and was not reflective of bias requiring reversal). *Cf. People v. Eckert*, 194 Ill. App. 3d 667, 551 N.E.2d 820 (1990) (defendant denied fair trial where there were repeated expressions of hostility against defense counsel by court and where improper restrictions were placed on counsel during cross-examination). Thus, when the judge's comments and actions throughout the course of the transfer hearing are viewed in their entirety, we cannot say that the judge was biased or prejudiced against psychiatric experts as a whole or against defendant's expert, Doctor Miller, specifically, such that the defendant was denied a fair and impartial transfer hearing. Because we find that, when viewed in context, we are unable to conclude that the trial judge exhibited a predisposed bias, we correspondingly cannot conclude that there was a violation of any judicial cannon resulting from the judge's failure to *sua sponte* recuse himself.

The defendant next argues that the trial court improperly relied upon evidence outside the record, namely, the two books mentioned above, and whether the trial judge improperly speculated as to the length of time that the defendant would serve if convicted as an adult or if adjudicated as a juvenile.

■ It is well settled that a trial court's deliberations are limited to the record made before him during the course of trial, and the trial court cannot make a determination based upon its private investigation or knowledge untested by cross-examination or rules of evidence. *E.g., People v. Wallenberg*, 24 Ill. 2d 350, 181 N.E.2d 143 (1962); *People v. Gilbert*, 68 Ill. 2d 252, 369 N.E.2d 849 (1977); *In re Marriage of Pleasant*, 256 Ill. App. 3d 742, 628 N.E.2d 633 (1993). It is also well settled that when the trial court is the trier of fact every presumption will be accorded that the judge considered only admissible evidence and disregarded inadmissible evidence in reaching his conclusion. *Wallenberg*, 24 Ill. 2d 350, 181 N.E.2d 143; *Gilbert*, 68 Ill. 2d 252, 369 N.E.2d 849. In the instant case we do not believe that this presumption was rebutted by the record before us. See *Gilbert*, 68 Ill. 2d 252, 369 N.E.2d 849. Here, all that the record shows with respect to the two books is that the trial judge made a reference to them in a little more than one page of a 31-page pronouncement in

the record. The judge prefaced his citation to the books with a statement that he found Doctor Miller to be eminently qualified and acknowledged that "[he] may be bringing in evidence *** which maybe [he] shouldn't." The judge concluded his reference to the books by stating that he was not "discounting" Doctor Miller's testimony. That the judge was not biased against Miller is further supported by the record, which is replete with questions posed by the judge to Miller which show an attempt by the judge to understand Miller's testimony and its ramifications.

Moreover, as will be discussed below, the trial judge made his determination in favor of transfer after making extensive findings with respect to the seven statutory factors delineated in section 5—4 of the Juvenile Court Act. It is the court's extensive review of the evidence as it related to the transfer statute and the court's focus on that evidence rather than on the authors' opinions in the two books that distinguishes this case from the cases cited by the defendant. In those cases, *i.e., People v. McMiller*, 410 Ill. 338, 102 N.E.2d 128 (1951), *People v. Cooper*, 398 Ill. 468, 75 N.E.2d 885 (1947), *Pleasant*, 256 Ill. App. 3d 742, 628 N.E.2d 633, and *Patton v. Armstrong*, 6 Ill. App. 3d 998, 286 N.E.2d 351 (1972), the trial judges' recorded statements clearly indicated that they had considered matters *dehors* the record and relied upon those matters in reaching their decisions.

■ We also reject defendant's contention that the trial court improperly considered speculative evidence regarding the length of time that the defendant would serve if convicted as an adult or if adjudicated as a juvenile.

In the instant case, the court estimated that the time the defendant would serve if he were tried and convicted as an adult would be the minimum 21-year term of imprisonment. See 730 ILCS 5/5—8—1(a)(1) (West 1992). The court further stated that the defendant could earn 12$^1$/$_2$ years of credit, based upon good conduct and educational credits, such that he would serve only 7$^1$/$_2$ years. See 730 ILCS 5/3—6—3(2) (West 1992). The court compared that figure to the time the defendant could be held within the juvenile system, which was until his twenty-first birthday, a period of six years.

One of the factors to be considered by the court in making a transfer determination is whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority. 705 ILCS 405/5—4(2)(b)(vi) (West 1992). That factor requires a balancing of the competing interests of the minor and society and recognizes that it may be necessary to incarcerate the minor beyond his minority. *People v. Clark*, 119 Ill. 2d 1, 518 N.E.2d 138 (1987). As

stated in *Clark*, 119 Ill. 2d at 15, 518 N.E.2d at 144, that "balancing calls for consideration of which penalty [incarceration to age 21 under the juvenile system or incarceration under the Criminal Code of 1961 (720 ILCS 5/1—1 *et seq.* (West 1992))] would best serve both of the interests at stake." In performing that balancing, the court must consider the range of penalties under both systems.

The defendant concedes that the trial court could consider the range of sentence that the minor could receive if convicted in the adult system. The defendant also concedes that the parties stipulated that, if convicted of first degree murder as an adult, the defendant would face a mandatory sentence of between 20 and 60 years in prison. See 730 ILCS 5/5—8—1(a)(1) (West 1992). The defendant argues, however, that the court engaged in speculation in presuming that, if convicted as an adult, the defendant would be sentenced to the minimum 20-year term of imprisonment and that the defendant would receive credits for good conduct to reduce the time he would actually serve. We disagree.

There is no compelling indication from the record that the court ignored the possibility that the defendant could receive a sentence greater than 20 years if tried as an adult. In order to determine whether the penalty under the Juvenile Court Act or the penalty under the Criminal Code would best serve both the competing interests of the minor and society (see *Clark*, 119 Ill. 2d at 15, 518 N.E.2d at 144), the trial court was required to consider the interplay between the relevant sentencing statutes and to extrapolate from that based upon the evidence before it. Admittedly, the penalty to be imposed upon the defendant under the Criminal Code was not definitive because it would be discretionary with the sentencing judge after trial and conviction. The juvenile court judge was well aware of that fact, because he continuously prefaced his calculations in this regard by using the word "if." It would seem that, in order to compare the statutory penalties, the judge should not be precluded from considering which sentence was more likely, provided the judge does not confuse likelihood with certainty. Here, based upon the nature of the crime and the defendant's background, the court suggested that a 20-year term of imprisonment was a more reasonable sentence under the Criminal Code. (In point of fact, that possibility was very close to the 25-year sentence actually imposed.)

We note that the defendant has cited no case that prohibits a judge from considering the more likely sentence within the statutory range based upon the nature of the crime and other relevant facts such as the defendant's background and record. The only case cited by the defendant is *People v. Gilbert*, 68 Ill. 2d 252, 369 N.E.2d 849

(1977), which held that it is improper for a trial judge to conduct experiments or private investigations to produce evidence not introduced at trial. No experiment or investigation was conducted independently by the juvenile court judge in the instant case.

When considering defendant's potential sentence under the Criminal Code, the court also was free to take into account the defendant's ability to earn good conduct credits that would reduce his time served. That consideration was not speculative since good conduct credits are statutorily mandated (see 730 ILCS 5/3—6—3(2) (West 1992)) and since the good behavior for earning those credits is within the defendant's control. Although the judge could not predict how the defendant would conduct himself while incarcerated, he could consider that the defendant, through his conduct, would reduce his sentence.

In performing the required balancing, the court is mandated to compare the potential lengths of sentence as an adult with the limited range of sentence under the Juvenile Court Act which would compel defendant's release upon his reaching the age of majority. Based upon these considerations, the trial court concluded that the defendant could not be rehabilitated within the period of time he could be detained within the juvenile court system and that the interests of society and the minor required that the minor continue in custody for a period extending beyond his minority. See *In re L.J.*, 274 Ill. App. 3d 977, 654 N.E.2d 671 (1995) (comparing penalties and determining that best interest of minor and society required that minor be tried as adult); *People v. Booth,* 265 Ill. App. 3d 462, 637 N.E.2d 580 (1994) (court found society would not be protected if juvenile incarcerated under the Juvenile Court Act).

■ Defendant's final argument on appeal is that the trial court's order granting the State's motion to transfer was an abuse of discretion. We disagree.

The record in the instant case shows that the trial court conducted a full hearing and rendered its decision after examining the seven factors specified in section 5—4 of the Juvenile Court Act. With respect to those factors, the court specifically found that: (1) there was sufficient evidence upon which the grand jury could indict the defendant; (2) the defendant did not act in self-defense but, rather, committed the offense in an aggressive and premeditated manner as evidenced by the fact that he retrieved the gun prior to the incident and shot the victim as he walked away and without provocation; (3) the defendant was within the statutory age requirement; (4) the defendant had a history of violence when rebuffed; and (5) the defendant possessed a deadly weapon when committing the alleged offense. With respect to the final two factors, whether juvenile facilities

were available for treatment and rehabilitation and whether the best interest of the minor and the security of the public required that the defendant remain in the custody for a period extending beyond his minority, the court made extensive remarks. The court cited to Irene Porter's testimony and reports, her belief that the defendant has a propensity toward violence, and her final recommendation in favor of transfer. The court discussed the testimony of Doctor Miller, who was found to be "imminently [*sic*] qualified" and "honest," concerning defendant's dysfunctional and disruptive home life, lack of a male role model, and lack of remorse based upon a belief that he shot Harper but that the hospital caused Harper's death. The court noted Miller's testimony that the defendant's actions were committed by choice and designed to punish Harper for a wrong Harper had committed against the defendant. The court disagreed, however, with Miller's estimation that the defendant could be rehabilitated after two years of treatment in the juvenile division, particularly since Miller did not know what counseling the defendant would receive or whether the defendant would be cooperative.

In addition, the court noted its personal observations of the defendant and the lack of any expression of emotion or remorse shown by him. The court stated that the defendant's face was "impassive" and that he was "amoral," perhaps because he was not "exposed to any love and tenderness and kindness." The judge stated, "I don't believe that the juvenile court has facilities necessary to treat him and correct him. *** He needs long treatment."

The court then discussed the testimony of the remaining witnesses, including defendant's four witnesses who had contact with him while he was held in the juvenile detention center, who stated that the defendant was a good student, had not been a disciplinary problem, and could be rehabilitated in the juvenile system. In that regard, the court noted that those various witnesses were not psychiatrists and had limited knowledge of defendant's rule violations.

Finally, the court discussed the evidence offered with respect to the differences in juvenile and adult correctional facilities, finding that the education provided in both types of facilities was the same; that vocational training was available in both; and that counseling and medical treatment were available in both, acknowledging, though, that those services were more limited in the adult system. The court concluded by comparing the time the defendant would serve if incarcerated under the Criminal Code and if incarcerated under the Juvenile Court Act.

Based upon these specific considerations, it is clear that the trial

judge weighed the last two transfer factors, availability of facilities for treatment and rehabilitation and the interests of the minor and society, as he had weighed the other five factors, in favor of transfer. In that regard, the court was free to give greater weight to the testimony of Irene Porter, defendant's juvenile probation officer, who had had the longest affiliation with the defendant, who discussed defendant's propensity toward violence and who recommended transfer, rather than to Miller's expert testimony that the defendant's violent nature could be corrected in the juvenile system in two years. See *People v. Liggett*, 90 Ill. App. 3d 663, 413 N.E.2d 534 (1980) (court is not required to accept opinion of expert concerning psychological prognosis of defendant). In reaching its decision in favor of transfer, the court also could consider the fact that Miller had only visited the St. Charles juvenile facility and had no familiarity with the other juvenile facilities or any of the adult correction facilities.

■ The defendant argues that the court's comment that the defendant showed no remorse during the transfer hearing amounted to a violation of the defendant's fifth amendment right against self-incrimination. In support of this argument, the defendant cites to several cases in which reversible error occurred as a result of improper comment regarding a defendant's failure to testify. *E.g.*, *Lesko v. Lehman*, 925 F.2d 1527 (3d Cir. 1991), *cert. denied*, 502 U.S. 898, 116 L. Ed. 2d 226, 112 S. Ct. 273; (1991); *United States v. Safirstein*, 827 F.2d 1380 (9th Cir. 1987); *People v. Ramirez*, 98 Ill. 2d 439, 457 N.E.2d 31 (1983). Those cases are distinguishable from the case at bar because the reprehensible remarks that occurred in them were directly related to the defendants' failures to testify after they asserted their fifth amendment rights. See *Lesko*, 925 F.2d 1527 (improper prosecutorial comment regarding defendant's failure to testify on the merits when defendant testified at penalty stage); *Safirstein*, 827 F.2d 1380 (improper enhancement of sentence where defendant penalized for exercising privilege against self-incrimination and failing to implicate others or otherwise admit guilt); *Ramirez*, 98 Ill. 2d 439, 457 N.E.2d 31 (improper prosecutorial comment regarding defendant's failure to testify during sentencing hearing although defendant testified at trial). Only in *Lesko* does the comment made by the prosecutor during closing argument include a reference to the defendant's failure to "say that I'm sorry." Viewed in its entirety, however, that comment was construed by the court to be "a condemnation of Lesko's failure to testify about his role in the events surrounding the *** homicide." *Lesko*, 925 F.2d at 1544. Here, unlike in the cases cited by the defendant, the remark made by the trial judge, that the defendant lacked remorse, cannot be construed as

implicating the defendant's failure to testify. Rather, as is apparent from the remarks set out above, the judge was commenting on the defendant's demeanor and lack of affect with respect to a crime whose commission the defendant admitted to in a writing not challenged on any constitutional grounds. See *People v. Nelson*, 92 Ill. App. 3d 35, 42, 415 N.E.2d 688, 694 (1980) (evidence regarding defendant's demeanor is not within the fifth amendment privilege); see also *Smith v. Estelle*, 602 F.2d 694, 704 (5th Cir. 1979), *aff'd on other grounds*, 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981) (suggesting that psychiatrist's conclusions concerning defendant's manner or deportment, his attention span or facial expressions, are not a communicative act protected by the fifth amendment).

Moreover, the judge's observations and conclusions with respect to the defendant's affect were corroborated by the defendant's own psychiatric expert who testified that the defendant was "amoral," consciously chose to shoot Harper after Harper had turned to walk away, and was unable to link his act of shooting Harper as being the cause of Harper's death. There is no question that defendant's own witness can testify to the defendant's amorality based upon his overt communication with the defendant. This is to be distinguished, however, from the holding in the Supreme Court case of *Estelle v. Smith*, 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981), a case cited by the defendant, which involved the admission of testimony from a court-appointed psychiatrist. In that case, the psychiatrist sought to testify concerning the defendant's lack of remorse or sorrow based, not upon the psychiatrist's observance of the defendant's demeanor, but upon statements the defendant made to the psychiatrist during the psychiatric examination. The *Estelle* court held that the psychiatrist's testimony regarding communicative acts of the defendant was inadmissible because the defendant had not been admonished before the psychiatric examination that his statements could be used against him. Here, as noted, the court's conclusions that the defendant lacked remorse and was "amoral" were based upon its own observations of the defendant's demeanor during the court proceedings as well as the testimony of the defendant's psychiatrist whose observations of the defendant's demeanor and communications with the defendant were not subject to the constitutional restraints that attach to communications with a defendant by court-appointed psychiatrists.

The defendant's transfer hearing was extensive and sufficient evidence to support the court's transfer determination was presented. While there was evidence to support a contrary determination, we cannot say that the trial court's grant of the State's motion to transfer

was an abuse of discretion. See *Clark*, 119 Ill. 2d at 19-20, 518 N.E.2d at 146-47 (for listing of cases wherein evidence was found sufficient to support trial court's transfer determination).

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

COUSINS and HOURIHANE, JJ., concur.