THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LUIS VASQUEZ, Defendant-Appellant.

First District (5th Division) No. 1—99—1888

Opinion filed December 31, 2001.—Rehearing denied February 20, 2002.

Michael J. Pelletier and Michael C. Bennett, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Annette Collins, and Susan R. Schierl Sullivan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

Defendant, Luis Vasquez, was charged by indictment with first degree murder, armed robbery and aggravated battery. Following a jury trial defendant was found guilty of armed robbery and acquitted of the other charges. After the verdict, the State moved to have defendant, who was 16 at the time of the offense, sentenced as an adult. The trial court granted the motion and defendant was sentenced to a term of 30 years' imprisonment in the Illinois Department of Corrections. Defendant now timely appeals.

On appeal defendant argues that his case must be remanded for a new sentencing hearing where: (1) the sentencing statute under which defendant was charged as an adult is unconstitutional as being violative of the single subject rule; (2) the trial court abused its discretion in failing to take into account all statutory factors enumerated in the sentencing statute; and (3) defendant's sentence was disparate to that of his codefendants.

I. Background

The pertinent facts of the case involve the events that took place during the evening hours of January 24, 1997. Assistant State's Attorney Kari Mason testified at trial that she was assigned to investigate the first degree murder and armed robbery of Joaquin Diaz. Mason stated that after speaking with detectives assigned to the case, she met with the 16-year-old defendant at Area 1 police headquarters on January 27, 1997. Defendant's mother was present for this interview. After advising defendant of his *Miranda* rights, defendant stated that on January 24, 1997, at 8 p.m. he was with Claudio Martinez, Anthony Saucedo and Marcos Sanchez in a van driving around. Defendant told Mason that while driving they saw two members of the Party People gang, a gang which was a rival of his gang. Defendant stated that he was a member of the La Raza gang. Defendant stated that they stopped the van and exited the vehicle looking to fight with the Party People.

Defendant said that as they approached the two Party People, he noticed that there was nothing in their hands. He said that one of "his boys" threw a bottle at one of the Party People. Defendant told Mason that the person who was struck picked up the bottle and threw it back, striking defendant in the eye. Defendant stated that he then approached the person who threw the bottle at him and punched him in the head. He said that he saw his friend Anthony Saucedo, also known as T-Bone, with a stick or pipe. Mason testified that at that point defendant's mother told defendant not to answer any more questions. Mason also stated that she observed defendant's left eye was bruised and cut.

Ivan Flores testified for the State under a grant of use immunity. Flores testified that on January 24, 1997, he was a member of the La Raza gang and was nicknamed "Little Popeye." Flores stated that defendant was also a member of La Raza on that date and that his nickname was "Popeye." Flores testified that he was riding in a van on January 24, 1997, with defendant, Martinez (nicknamed "Flaco"), Saucedo (nicknamed "T-Bone"), Sanchez (nicknamed "Pelon") and two girls, drinking beer. Flores said that while riding in the van someone yelled there were some Party People. Flores stated that the van stopped and Pelon, T-Bone, Flaco and Popeye got out of the van. Flores testified he saw a bunch of people fighting and beating each other, but he was unable to identify each person's exact activity. Flores testified that he saw one of the four La Raza gang members with a pipe striking one of the Party People, but he could not identify which of the four it was.

Assistant State's Attorney John Maher then testified that on January 26 he obtained a written statement from Flores. Flores' statement

provided a more detailed version of the incident. Maher testified that Flores told him that Martinez exited the van with a beer bottle. Flores stated Saucedo had a pipe in the van, but Sanchez actually exited the vehicle with that pipe. Maher also testified that Flores told him that one of the Party People, the one who was hit with the bottle, was "getting his ass kicked by three or four La Raza guys" while the other Party People member had run away. Flores told Maher that Martinez hit one of the two men over the head with a bottle. Additionally, Flores told Maher that defendant came back to the van wearing the leather coat of the boy whom everyone was "stomping." Maher stated that Flores read the statement, reviewed it, made corrections and signed every page.

Urbano Alvarez testified, through the assistance of an interpreter, that on January 24, 1997, at around 8 p.m., he left his house with Joaquin Diaz headed for Diaz's house on Washtenaw Avenue. Alvarez stated that both he and Diaz were wearing leather jackets that evening. Alvarez testified that while crossing 60th Street, he noticed a group of people, all dressed in black, walking toward them. Alvarez said he turned around and saw a van behind them. Alvarez stated that one of the people in the group, whom he later identified as Martinez, pulled off his hood, said "La Raza -----------" and hit Diaz with a beer bottle. Alvarez stated that a different person, whom he later identified as Saucedo, had a metal or wood pipe. Alvarez stated that while he was held by the arm, he saw about four people beating Diaz, who was lying on the ground. Alvarez testified that he managed to free himself and run toward Diaz's home to get help from Alfredo Monroy and James Monroy, Diaz's cousins. Alvarez stated that the group was still beating Diaz when he left. Alvarez said that when he returned, Diaz was lying on the opposite side of the street covered in blood.

Jamie Monroy testified that on January 24, 1997, Urbano came to his house on Washtenaw Avenue, yelling that Diaz was being beaten. Jamie was living at that house with his brother Alfredo, Diaz and two friends. Jamie testified that as he left the house, shortly after Urbano and Alfredo, he saw a blue van parked in front of his house. Jamie stated that he walked slowly past the van and then ran to where Diaz was lying on the ground. Jamie testified that Diaz was covered in blood and that when he put his hands behind Diaz's head he felt that the back of Diaz's head was open.

Alfredo Monroy testified that after Urbano came to the house he ran to where Diaz was being beaten. Alfredo testified that he saw Diaz on the ground and another "guy" beating him in the chest and face. Alfredo said he yelled and the "guy" pulled Diaz's jacket off and ran

through a passageway between two houses. Alfredo later identified Sanchez in a lineup as the person still on top of Diaz as they approached.

Dr. Mitra Kalelkar, assistant chief medical examiner, testified that on January 26, 1997, she performed an autopsy on Joaquin Diaz. Dr. Kalelkar testified regarding the extensive injuries to Diaz's head. Dr. Kalelkar noted very severe hemorrhages underneath the scalp, a fractured and depressed skull cap and a severely contused brain. In Dr. Kalelkar's opinion, these injuries were consistent with being struck with a metal pipe. Dr. Kalelkar opined that Diaz died as a result of extensive cranial cerebral injuries.

Defendant testified on his own behalf at trial. Defendant admitted that in January of 1997 he was a member of the La Raza gang. Defendant testified that on January 24, 1997, he was with T-Bone, Flaco, Pelon, Little Popeye, and two girls "drinking and smoking weed" in a van. Defendant stated that while driving around in the area of 59th and Washtenaw, he and Flaco (Martinez) exited the van at a friend's house. Defendant testified that at that point they saw two Party People walking toward them. Defendant admitted that 59th and Washtenaw was Party People territory and that the Party People gang was at war with the La Raza gang. Defendant stated that when they approached the Party People, a fistfight began. Defendant stated he was hit with a beer bottle near his eyebrow. Defendant testified that at that point he returned to the van and left Martinez still fighting. He saw T-Bone (Saucedo) exit the van with a pipe. Defendant testified that he remained in the van until the fight was over. Defendant denied that they were driving in the area looking to fight with Party People. Defendant admitted that he was arrested and taken to Area 1 with Martinez, Sanchez and Flores on January 25 but denied ever speaking to any police officers while there.

In rebuttal, Officer Frank Valdez testified that he spoke with the defendant on January 26 at Area 1. Valdez stated that the defendant told him that he was home all day on January 24 under home confinement.

At the close of all the evidence, the jury returned a verdict finding defendant guilty of the armed robbery of Joaquin Diaz but not guilty of the first degree murder of Diaz and not guilty of the aggravated battery of Alvarez. The State subsequently filed a motion to have the defendant sentenced as an adult pursuant to section 5—4(6)(c)(ii) of the Juvenile Court Act (705 ILCS 405/5—4(6)(c)(ii) (West 1996)). On May 5, 1999, the motion was granted and the case proceeded to sentencing.

During sentencing, the State called Officer Bill Quinn. Quinn

testified that on January 23, 1996, in responding to a gang distur-
bance call, he arrested defendant, along with 11 others, for underage
drinking. A handgun, thrown to the floor by Michael Reyes, was
recovered at the scene. Saucedo was arrested on that date along with
the defendant. On the way to the police station, defendant admitted
he was a member of the La Raza gang.

Officer Bochnak testified that he arrested defendant on April 7,
1996, for assault. The victim informed officers that he and defendant
got into a verbal altercation when defendant pointed a handgun at the
victim. Defendant admitted that he was a member of the La Raza
gang.

Officer John C. Haggerty testified that on November 22, 1996, he
responded to a battery call at approximately 8 p.m. The victim
informed Haggerty that about five La Raza gang members approached
him and began to beat him. The victim identified both defendant and
Saucedo as two of the people who beat him. Defendant again admitted
that he was a member of the La Raza gang.

Defendant did not present any evidence in mitigation. The trial
court sentenced the defendant to 30 years' imprisonment in the Il-
linois Department of Corrections. Defendant's motion to reduce or
reconsider the sentence was denied. Defendant now timely appeals.

## II. ANALYSIS

### A. Constitutionality of the sentencing statute

In his opening brief, defendant argued that the amendment to sec-
tion 5—4(6)(c)(ii) was passed as part of Public Act 88—680 (eff. Janu-
ary 1, 1995), known as the "Safe Neighborhoods Law," which was
subsequently struck down by our supreme court in *People v. Cer-
vantes*, 189 Ill. 2d 80 (1999). The State responded that the amendment
was actually passed in Public Act 88—239. Defendant concedes this is-
sue for the purposes of appeal and, therefore, we deem it waived for
review.

### B. Abuse of discretion

██ ██ Defendant argues that his sentence must be remanded for a
new hearing on his eligibility for sentencing as an adult where the
trial court abused its discretion. In this case, although defendant was
only 16 years old at the time of the offense, he was charged as an
adult pursuant to section 5—4(6)(a), which provided:

> "The definition of delinquent minor under Section 5—3 of this
> Act shall not apply to any minor who at the time of the offense was
> at least 15 years of age and who is charged with first degree mur-

der ***. These charges and all other charges arising out of the same incident shall be prosecuted under the Criminal Code of 1961." 705 ILCS 405/5—4(6)(a) (West 1992).

Although defendant was acquitted of first degree murder, the defendant was convicted of armed robbery. Therefore, defendant was sentenced under section 5—4(6)(c)(ii), which provided:

"(ii) If after trial or plea the minor is only convicted of an offense not covered by paragraph (a) of this subsection (6), the conviction shall not invalidate the verdict or the prosecution of the minor under the criminal laws of the State; however, unless the State requests a hearing for the purpose of sentencing the minor under Chapter V of the Unified Code of Correction, the Court must proceed under Sections 5—22 and 5—23 of this Act. Should the State request a hearing it must do so by written motion within 10 days following the entry of a finding or the return of a verdict. Reasonable notice of the motion shall be served upon the minor or his counsel. If the motion is made by the State, the court shall conduct a hearing to determine if the request should be granted. In making its determination on the motion, the court shall consider among other matters: (a) whether there is evidence that the offense was committed in an aggressive and premeditated manner; (b) the age of the minor; (c) the previous history of the minor; (d) whether there are facilities particularly available to the Juvenile Court or the Department of Corrections, Juvenile Division, for the treatment and rehabilitation of the minor; (e) whether the best interest of the minor and the security of the public require sentencing under Chapter V of the Unified Code of Corrections; and (f) whether the minor possessed a deadly weapon when committing the offense." 705 ILCS 405/5—4(6)(c)(ii) (West 1996).

We note that section 5—4(6)(c)(ii) was amended effective January 1, 1994. Prior to that date, section 5—4(6)(c)(ii) required the trial court to sentence the defendant to the juvenile division of the Department of Corrections when the defendant was found not guilty of murder. Defendant maintains that the trial court failed to take all statutorily enumerated factors into account when determining whether he should be sentenced as an adult or transferred back to juvenile court for a dispositional hearing.

The trial court is bound to consider the specific criteria set forth in the Juvenile Court Act. *People v. Ollins*, 231 Ill. App. 3d 243, 247, 595 N.E.2d 1295 (1992). However, no one factor is determinative nor must each factor be given equal weight. *People v. Martin*, 285 Ill. App. 3d 623, 631, 674 N.E.2d 90 (1996). Not all of the statutory criteria must be resolved against the minor to justify treating him as an adult. See *People v. Sistrunk*, 259 Ill. App. 3d 40, 48, 630 N.E.2d 1213 (1994).

"Where the record shows that the [trial] court considered all the factors and its determination is not an abuse of discretion, then the ruling will be affirmed on appeal." *People v. Martin*, 285 Ill. App. 3d at 631.

■ The record in this case shows that the State filed a motion requesting a hearing for the purpose of sentencing the defendant as an adult. The defense requested and received a 30-day continuance to prepare a response to the State's motion. The trial court then conducted a hearing and reviewed the evidence relating to the statutory factors. Defendant only takes issue with the trial court's evaluation of the fourth and fifth factors provided in the statute. As the trial court properly evaluated and applied the statutory factors, we find that the trial court did not abuse its discretion in sentencing the defendant as an adult.

We first note that defendant maintains that the statutory factors in section 5—4(6)(c)(ii) to be considered in a "transfer back" hearing are "nearly identical to the factors the juvenile court must consider in making a determination whether to transfer a juvenile to the adult court" under 5—4(3)(a). Defendant concludes, therefore, that the factors should be evaluated in precisely the same manner. However, defendant cites no case law for the proposition that the factors are to be analyzed in such a manner.

Defendant cites *People v. Brown*, 301 Ill. App. 3d 995, 1008, 705 N.E.2d 162 (1998), which stated:

"By allowing the trial court discretion to determine whether to transfer the juvenile back to juvenile court, the trial court is afforded the opportunity to balance the interests of the community and the minor in reaching a sentencing determination, just as it had an opportunity to balance the interests in reaching a prosecutorial determination. Further, the trial court should use the same guidelines provided in section 5—4(3)(b) in reaching a decision on whether to transfer the juvenile."

However, the defendant in *Brown* was 14 at the time of the offense and therefore was not subject to the mandatory transfer provision in section 5—4(6)(a).

The State points out that in cases involving mandatory transfer, our supreme court has held: "[T]he legislature itself balanced the competing interests of minor offenders and society where it is alleged that a minor has committed 'murder, [or] aggravated criminal sexual assault' and 'was at least 15 years of age' at the time of the alleged offense. [Citation.] Under these circumstances, the legislature struck the balance in favor of societal security by vesting exclusive jurisdiction over these alleged juvenile offenders within the criminal court."

*People v. Clark*, 119 Ill. 2d at 13. Therefore, while the factors may be evaluated similarly, unlike the straight balancing between the interests of the minor and society when the defendant is under 15 years of age in section 5—4(3)(a), when a minor is mandatorily transferred to criminal court pursuant to section 5—4(6)(c)(ii), a balancing has in essence already occurred, weighing in favor of protecting society.

We note that there are subtle differences in the language of the two statutes. While the fourth factor under section 5—4(3)(b) requires the court to consider whether "there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor" (705 ILCS 405/5—4(3)(b) (West 1996)) the fourth factor under section 5—4(6)(c)(ii) requires the court to consider whether "there are facilities particularly available to the Juvenile Court or the Department of Corrections, Juvenile Division, for the treatment and rehabilitation of the minor" (705 ILCS 405/5—4(6)(c)(ii) (West 1996)). Likewise, the fifth factor under section 5—4(3)(b) requires the court to consider whether "the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority" (705 ILCS 405/5—4(3)(b) (West 1996)), where the fifth factor under section 5—4(6)(c)(ii) asks whether "the best interest of the minor and the security of the public require sentencing under Chapter V of the Unified Code of Corrections" (705 ILCS 405/5—4(6)(c)(ii) (West 1996)).

Even if we were to accept defendant's argument that trial courts should consider the factors in section 5—4(6)(c)(ii) in the same manner as the factors in section 5—4(4)(3), we note that section 5—4(4)(3.3)(a) provides:

"If the State's Attorney files a motion under sub-section (3)(a) to permit prosecution under the criminal laws and the petition alleges the commission by a minor 15 years of age or older of: (i) a Class X felony other than armed violence *** and the State's Attorney's motion to transfer the case alleges that the offense committed is in furtherance of the criminal activities of an organized gang *** and, if the juvenile judge designated to hear and determine motions to transfer a case for prosecution in the criminal court determines that there is probable cause to believe that the allegations in the petition and motion are true, there is a rebuttable presumption that the minor is not a fit and proper subject to be dealt with under the Juvenile Court Act of 1987, and that, except as provided in paragraph (b), the case should be transferred to the criminal court." 705 ILCS 405/5—4(3.3)(a) (West 1996).

In the instant case, it is clear that the attack on Diaz was committed in furtherance of the criminal activities of defendant's gang.

Consequently, even if we were to apply the factors of section 5—4(3.3)(a), we would be compelled to find that defendant has failed to rebut the presumption that he is not a fit and proper subject to be dealt with under the Juvenile Court Act.

Defendant argues that the trial court erroneously evaluated the fourth factor under the statute because, in sentencing defendant, the court did not specifically refer to the defendant's exposure to juvenile programs. The record reveals that the trial court, at the conclusion of the hearing on the State's section 5—4(6)(c)(ii) motion, stated:

"Based on the factors enumerated in the statute, I find that this crime, under subsection A, was committed in an aggressive and premeditated manner. The evidence before me suggested that the defendant joined with his fellow gang members in a specific mission to seek out and harm rival gang members. The aggressiveness of the crime is shown by the numbers of the defendant and his gang members against the victim in this case, and the deadly weapon that was used to kill the victim. The defendant was 16 at the time of the offense. The only evidence before me at this juncture is a prior aggravated assault finding as a juvenile. Based on the actions of the defendant and his accountability for the actions of his fellow co-defendants, his rehabilitative potential is certainly questionable. Based on his actions, even at his young age, certainly the public needs to be protected from him. And the defendant was accountable for a deadly weapon being possessed and used to beat to death the victim in this case. For all these reasons, I find that the defendant shall be sentenced as an adult under the Unified Code of Corrections Chapter 5."

Although defendant is correct in stating that the trial judge did not specifically mention the availability of treatment or rehabilitation services in juvenile court or the juvenile division of the Illinois Department of Corrections, that alone is not conclusive proof that the trial judge did not evaluate this factor. See *People v. Luckett*, 295 Ill. App. 3d 342, 348, 692 N.E.2d 1345 (1998). As the court in *Luckett* noted, the fourth factor was mentioned to the trial judge by both the prosecutor and the defense counsel.

In the case at bar, defense counsel addressed the fourth factor, stating "there's been no evidence that he is incapable under D of being held in a particular juvenile Department of Corrections. There's been no evidence to suggest that this young man cannot go to the juvenile Department of Corrections or that he or his behavior is somehow indicative of an individual that has to be housed in an adult facility." In the written section 5—4(6)(c)(ii) motion, the State addressed the fourth factor, stating "given the fact that defendant is now 18 years old, the State does not believe the defendant requires a specific

or a particular juvenile facility." Additionally, the prosecution notified the trial court in its section 5—4(6)(c)(ii) motion that defendant was on juvenile probation for a prior aggravated assault when he committed the instant offense and listed defendant's numerous contacts with the law. Some of those prior contacts involved codefendants in this particular case. The trial court's comment regarding its skepticism of defendant's rehabilitative potential was based upon the information provided by both defense counsel and the State. In considering defendant's continued criminal actions, "even at his young age," the court determined defendant's proper place remained in the criminal court. This determination was made in a manner consistent with this court's holding in *People v. Luckett*, 295 Ill. App. 3d 342, 348, 692 N.E.2d 1345 (1998).

In the instant case, the defendant makes the additional argument that the trial court could not properly consider whether defendant was amenable to treatment where the record does not reflect that the court was informed as to whether defendant was ever in any rehabilitation programs unique to the juvenile court or the juvenile division of the Department of Corrections. However, the fourth factor requires the trial court to consider "whether there are *facilities* particularly available to the Juvenile Court or the Department of Corrections, Juvenile Division, for the treatment and rehabilitation of the minor." (Emphasis added.) 705 ILCS 405/5—4(6)(c)(ii) (West 1996). Defendant's contention on appeal that a sentencing court cannot comply with the fourth factor unless it is aware of the defendant's prior participation, if any, in rehabilitation programs is simply belied by the plain language of the statute.

Defendant also argues that the trial court erroneously evaluated whether the best interest of the minor and the security of the public required sentencing defendant as an adult. During the section 5—4(6)(c)(ii) hearing, the court explicitly stated, "based on his actions, even at a young age, certainly the public needs to be protected from him." The court further stated that "defendant was accountable for a deadly weapon being possessed and used to beat to death the victim in this case." The prosecutor argued that "the acts of this defendant clearly show that he has to be sentenced as an adult and not to think of the best interest of the defendant because obviously he, under the theory of accountability, is responsible for every single harm that was done to our victim and the taking of a leather jacket is what the jury found him guilty of." The prosecutor briefly reminded the court of the extensive injuries the young victim suffered and the fact that defendant is a self-admitted gang member. The State's motion indicated that the prior criminal history of the defendant supported sentencing him as an adult to protect the public.

Although defendant insists that the fifth factor requires a court to take into account the potential time in prison a juvenile will face, defendant cites to cases that evaluate the statutory factors used in a section 5—4(3)(a) determination. See *People v. Clark*, 119 Ill. 2d 1, 518 N.E.2d 138; see also *People v. D.B.*, 202 Ill. App. 3d 194, 559 N.E.2d 873 (1990). Cases interpreting the factors enumerated in section 5—4(6)(c)(ii), however, have not required the same. The court in *Luckett* merely stated, when reviewing the trial court's section 5—4(6)(c)(ii) determination, "[a]s far as the fifth factor, the defendant's actions clearly indicate a need to protect the public by sentencing the defendant as an adult." *People v. Luckett*, 295 Ill. App. 3d at 348. Further, as recently noted by our supreme court in *People v. Morgan*, 197 Ill. 2d 404 (2001):

> "[I]t is worth noting that in a later version of the Act, the legislature amended the statute on discretionary transfers to add: 'In considering these factors, the court shall give greater weight to *the seriousness of the alleged offense* and the minor's prior record of delinquency than to the other factors listed in this subsection.' (Emphasis added.) 705 ILCS 405/5—805 (West 2000)." *Morgan*, 197 Ill. 2d at 430.

Importantly, in a "transfer back" hearing, the decision whether to sentence defendant as an adult is made by the same court that will ultimately sentence the defendant. In making a determination pursuant to section 5—4(3)(a), the juvenile court is considering mere allegations. In making a determination pursuant to section 5—4(6)(c)(ii), the criminal court is considering the proper disposition of a defendant's case when he has been convicted after a trial. In the instant case, immediately prior to trial, the court advised defendant of the potential sentences he faced. In sentencing a defendant as an adult to a specific term of years, the criminal court judge is obviously taking into account not only the term of years the defendant potentially faces, but also the term of years he or she will actually impose. Based upon the record, we find that the trial court properly weighed the fifth factor in its determination as well.

Defendant does not contend that the trial court improperly weighed the other four factors under section 5—4(6)(c)(ii): the offense could not have been committed in a more aggressive manner, defendant was 16 at the time of the offense and 18 at the time of sentencing, the previous history of the defendant, and the defendant's codefendants used a deadly weapon to murder the unarmed victim. For all the above reasons, we hold that the trial court did not abuse its

discretion when it determined that the defendant should be sentenced as an adult.

C. Disparate sentence

Defendant also argues that his sentence should be reduced or his cause remanded where defendant's sentence was disparate to his codefendants' sentences. Specifically, defendant maintains that while he was sentenced to 30 years in prison for armed robbery, his codefendants were sentenced to 25 years' imprisonment for first degree murder and a consecutive 6-year sentence for armed robbery. Although his sentence was nearly equivalent to that of his codefendants, defendant maintains that the sentences are disparate because he was convicted of a less serious crime. We disagree.

■ Sentencing is a matter that rests within the sound discretion of the trial court, and, therefore, if it is within the statutory limits, a sentence will not be disturbed on appeal unless the trial judge abused that discretion. *People v. Nutall*, 312 Ill. App. 3d 620, 635, 728 N.E.2d 597 (2000). "The general rule as to the question of whether defendant's sentence was unfairly disparate is that arbitrary and unreasonable disparity between the sentences of similarly situated codefendants is impermissible." *People v. Taylor*, 318 Ill. App. 3d 464, 477, 742 N.E.2d 357 (2000). A mere disparity in sentences does not, by itself, establish a violation of fundamental fairness. *People v. Caballero*, 179 Ill. 2d 205, 216, 688 N.E.2d 658 (1997). In addition, the trial court is in the best position to determine the appropriate punishment, and its decision is entitled to great weight and deference. *People v. Fern*, 189 Ill. 2d 48, 53, 723 N.E.2d 207, 209 (1999); *People v. Modrowski*, 296 Ill. App. 3d 735, 751, 696 N.E.2d 28 (1998).

In *Taylor*, this court rejected an argument virtually identical to the defendant's argument in the case at bar. In *Taylor*, the defendant was sentenced to concurrent terms of 24 years on charges of armed robbery and home invasion and 4 years on a charge of residential burglary. Defendant argued that his sentence was disproportionate where Caples, an equally culpable codefendant, pled guilty to the more serious crime of murder and received only a 20-year sentence. We held that "[a] sentence imposed on a codefendant who pleaded guilty as part of a plea agreement does not provide a valid basis of comparison to a sentence entered after trial." *People v. Taylor*, 318 Ill. App. 3d at 477, citing *People v. Caballero*, 179 Ill. 2d at 217. As we acknowledged:

"In *Caballero*, the supreme court found that the codefendant who pled guilty (1) acknowledged his guilt and showed willingness to assume responsibility for his conduct; (2) made a public trial unnecessary; and (3) gave cooperation which resulted in the success-

ful prosecution of another offender engaged in equally serious or more serious criminal conduct. [Citation.] As a result, the supreme court found that the defendant could not establish that the disparate treatment of himself and his codefendant was unreasonable or unwarranted." *People v. Taylor*, 318 Ill. App. 3d at 477.

"Dispositional concessions are properly granted to defendants who plead guilty since the public interest in the effective administration of criminal justice is served." *People v. Nutall*, 312 Ill. App. 3d at 636.

■ In the case at bar, defendant was sentenced to 30 years' imprisonment for armed robbery. Armed robbery is a Class X offense, carrying a sentencing range from 6 to 30 years. 720 ILCS 5/18—2 (West 1996); 730 ILCS 5/5—8—1(a)(3) (West 1996). Therefore, although it was the maximum nonextended sentence allowable, defendant's sentence was clearly within the statutorily permissible range. The record establishes that the codefendants in this case entered into voluntary negotiated guilty pleas, whereby they pled guilty to the offenses of first degree murder and armed robbery with respect to Joaquin Diaz. In exchange, the State recommended, and the trial court imposed, consecutive sentences of 25 years for first degree murder and 6 years for armed robbery. The State nol-prossed the remaining attempted armed robbery and aggravated battery charges with respect to victim Urbano Alvarez. The defendant declined the plea agreement and chose to proceed to trial. In this case, defendant cannot establish that his sentence was disparate to that of his codefendants.

For the foregoing reasons, we affirm the defendant's convictions and sentence.

Affirmed.

CAMPBELL, P.J., and GREIMAN, J., concur.